**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3530
_____

CHARLES S. RENCHENSKI,
                              Appellant

v.

THOMAS WILLIAMS, JOSEPH PIAZZA, PA
DEPARTMENT OF CORRECTIONS, LARRY KASKIE,
Unit Manager of E-Unit at SCI Coal Township, FRANK D.
GILLIS, former Superintendent at SCI Coal Township,
KANDIS K. DASCANI, Grievance Officer at SCI Coal
Township, JOHN SIDLER, Licensed Psychologist Manager
at SCI Coal Township, SHARON M. BURKS, Chief
Grievance Officer in the Department of Corrections main
office Camp Hill, Pa
_____

On Appeal from the District Court
for the Middle District of Pennsylvania
(No. 06-cv-278)
District Judge: Honorable Richard P. Conaboy
_____

1

Argued July 12, 2010

Before: FUENTES, ALDISERT, and ROTH, Circuit Judges

(Opinion Filed:  October 4, 2010)

Jeffrey M Theodore (ARGUED)
David H. Coburn
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
*Attorneys for Appellant*

Howard G. Hopkirk (ARGUED)
Office of the Attorney General
Appellate Litigation Section
15th Floor, Strawberry Sq.
Harrisburg, PA 17102
*Attorney for Appellees*

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge:

Plaintiff Charles Renchenski is serving a life sentence without the possibility for parole for murder in the first degree. Although he was never charged with, nor convicted of, a sexual offense, in 2005 Defendants classified Renchenski as a sex

2

offender and recommended his enrollment in Pennsylvania's Sex Offender Treatment Program ("SOTP"). Renchenski filed this 42 U.S.C. § 1983 action alleging that his forced participation in sex offender treatment therapy violates several constitutional rights, including his: Fourteenth Amendment right to due process before being labeled a sex offender; Fifth Amendment right against self-incrimination; and Sixth Amendment right to have a jury adjudicate his guilt. He also challenges the District Court's conversion of Defendants' motion to dismiss into a summary judgment motion without granting him leave to take discovery. Because we hold that an inmate who has never been charged with, nor convicted of, a sex offense is entitled to due process before Pennsylvania classifies him as a sex offender, we reverse the District Court's Order entering summary judgment as to his procedural due process claim. We affirm the District Court in all other respects.

## I.[1]

Renchenski is incarcerated at the State Correctional Institution at Coal Township, Pennsylvania ("SCI-CT"), serving a life sentence without the possibility of parole for his 1985 conviction of the murder-by-strangulation of Rose Marie Foley. Renchenski's Pre-Sentence Report ("PSR") indicated that Ms. Foley was found in an isolated rural area, and that "the body . . . was clad only in a bra (which was unsnapped and pulled over

---

[1]    Unless otherwise noted, the following facts are not in dispute and are derived from the District Court's opinion as well as the Joint Appendix ("App.").

the breasts), a blouse which was also above the breasts, and socks." (App. at 317.) An autopsy revealed multiple blunt force trauma to the face and trunk, and abrasions and contusions on Foley's genitals. Additionally, her right breast was mutilated. Under interrogation, Renchenski admitted that he had cut away the skin around the victim's nipple in an attempt to prevent law enforcement from identifying his bite-marks. Finally, the autopsy noted hemorrhages in the area of her clitoris and vulva.

While Renchenski was never charged with, or convicted of, sexually assaulting Foley, his PSR did indicate "sexual" as a "past or present problem area." (App. at 321.) Nevertheless, his original correctional plan did not designate sexual as an area of concern.[2] From 1990 through 1999, however, Renchenski's prescriptive correctional program plan was altered to indicate that sexual was an area of concern. When Pennsylvania adopted its state-wide sex offender treatment program in 1999, prison officials granted Renchenski's request that this determination be removed from his correctional plan.[3] This status quo remained

---

[2] At the time Renchenski was committed to the DOC's custody, Pennsylvania had not adopted a standardized SOTP.

[3] Title 42 of the Pennsylvania Code, effective January 21, 2003, sets forth a judge's sentencing authority vis-à-vis sexual offenders. It provides, in relevant part, that:

A person, including an offender designated as a "sexually violent predator" . . . shall attend and participate in a Department of Corrections

4

in place until 2003, when Renchenski was transferred to SCI-CT.

Renchenski contends that after being transferred to SCI-CT, he complained to Defendant Williams, a prison counselor, about his loss of single-cell status. When his complaints went unanswered, Renchenski called Williams "slothful." Renchenski alleges that, in retaliation for this insult, Williams classified him as a sex offender and enrolled him in a slew of prison programs, including sex offender orientation, sex offender core, and sex offender maintenance.

Pennsylvania's SOTP is entitled "*Responsible Living: A Sex Offender Treatment Program*" and consists of a seven-phase behavioral modification course. Section 11(B) of the DOC's Policy Statement on Access to Mental Health Care ("Policy 13.8.1") governs "risk/need assessment" and outlines how the DOC evaluates sex offenders. It does not delineate how the DOC determines whether or not an inmate is a sex offender. *Id.*

---

program of counseling or therapy designed for incarcerated sex offenders if the person is incarcerated in a State institution for any of the following provisions under [Title 18].

42 Pa. Cons. Stat. § 9718.1(a). In other words, this statute mandates behavioral modification for sex offenders. Subsection (c) of this statute delegates to the DOC the authority to "develop and provide the program of counseling or therapy for offenders."

5

After the initial assessment, the treatment provider recommends a final risk level based on, among other things, the risk of recidivism, the attitude the inmate displays regarding sexual crimes, and any indication that the offender has a primary sexual attraction to children. *Id.* For prisoners assessed as moderate-to-high-risk offenders, the seven-step SOTP consists of one weekly two-hour group therapy session comprised of no more that fifteen participants that continues for approximately two years. *See* Policy 13.8.1 § 11(C)(2)(f). Throughout an inmate's involvement in the program, he or she can accumulate points for attendance, participation, and for completing homework assignments and major projects. An inmate "must accrue 85% of the total possible points in order to 'graduate' from the program." *Id.* While an inmate who denies a past history of sexual violence may initially participate in treatment, if he or she persists in maintaining his or her innocence, the inmate will be dismissed from the program.

The SOTP is run by qualified professionals. In order to serve as a credentialed treatment provider, a staff member must have a graduate degree in behavioral health or social sciences and at least two years of experience with sex offender treatment. Alternatively, a staff member may be credentialed if he or she has an undergraduate degree in behavioral health and at least 2,000 hours of clinical sex offender treatment. The SOTP is supervised by a Licensed Psychologist Manager.

Renchenski contested his sex offender designation, and his complaint was referred to John Sidler, SCI-CT's Chief Psychologist. Sidler dismissed his complaint, because "based on the official version of the offense, there [was] a high level of

sexual content involved. [Therefore, t]he Psychology Department supports . . . [the] decision to add sexual offender status." (App. at 84.) Sidler noted that a correctional plan, which is developed for each inmate, is designed to address an inmate's individual needs to prevent recidivism and to ensure a smooth transition back into society. Sidler indicated that he approved of Renchenski's designation as a sex offender because "[t]he official version of the crime indicate[d] that there was a sexual component to the crime, as Renchenski was engaged in a sexual act with the victim when the homicide occurred." (*Id.* at 286.) Sidler also stated that the "decision to recommend Renchenski for sex offender programs was based upon the [t]reatment team's evaluation of him coupled with the sexual component of Renchenski's offense." (*Id.* at 287.)

While Defendants claim that Renchenski's name currently appears on the institutional sex offender roster as a "possible sex offender," they maintain that he has not been classified as a sex offender because he has refused to submit to an assessment. (*Id.* at 289.) This assertion contradicts DOC's own policy, which provides that "[e]very inmate who refuses assessment and/or treatment shall be identified as falling in the Moderate/High risk category [of sex offender]." Policy 13.8.1 § 11(B)(4)(g). Moreover, Defendants' argument that Williams merely recommended to the Psychology Department that Renchenski be assessed to determine whether or not he needed sex offender treatment is unsupported by the record, which reveals that Williams recommended Renchenski participate in three specific sex offender programs: orientation, core and maintenance. *Id.* at 15; (App. at 265, 475.) Defendants also admit that, under the current SOTP, at the time the DOC

commences a new treatment group, Renchenski would be assessed for risk level and not for whether or not he needs treatment. *See* Appellee's Br. at 15.[4]

Defendants also contend that while "the recommended programming may be a requirement of an inmate's correctional plan, an inmate's participation in the specific program is voluntary." *Id.* at 10. This claim is also belied by the record. For example, Policy 13.8.1 § 119(C)(1)(h) and (i) mandates that sex offenders participate in treatment by using the phrase "shall receive all seven phases" of therapy. Furthermore, in response to Renchenski's grievance, Larry Kaskie, the Unit Manager, noted that if the Psychology Department determines he needs counseling, he will be required to submit to the program. (App. at 475.) In a subsequent correspondence, John Castrignano, a Psychological Services Specialist, informed Renchenski that "Participation in Sex Offender Programming is required as part of your Correctional Plan[.]" (*Id.* at 458.) (emphasis in original); *see also* (*Id.* at 454 [August 19, 2003 Letter from Superintendent Gillis to Renchenski indicating that it was in his "best interest to comply" with treatment.]). And while Renchenski concedes that his refusal to participate has no effect on his parole status, he notes that his protests nonetheless subject him to substantial

---

[4] In 2005 Renchenski was informed that SCI-CT was starting a new sex offender group which permitted enrollment of inmates who, like him, had in the past denied committing sex offenses. Even though attendance at the SOTP is a requirement of Renchenski's correctional plan, he refused to participate and therefore was never "assessed."

8

penalties, including the loss of his prison job, assignment to disciplinary custody for ninety days, cell restriction for thirty days, suspension of the right to receive visitors, and loss of privileges such as access to television, radio and the commissary. Appellant's Reply Br. at 2; *see* DC-ADM, 801, Inmate Discipline Procedures Manual § 4.

## 1.     Procedural History

Renchenski filed the instant action, pro se, alleging several constitutional violations.[5]  Defendants filed a motion to dismiss Renchenski's amended complaint for failure to state a claim, which Renchenski opposed.  The magistrate judge issued a Report and Recommendation, urging that dismissal was appropriate.  Following the receipt of Renchenski's objections to the Report and Recommendation, and Defendants' opposing brief, the District Court ordered Defendants to file a supplemental brief addressing: (1) whether Renchenski was currently under consideration for participation in the SOTP; (2) the process for making such a determination; and (3) what, if any, ramifications Renchenski faced for refusing to participate in therapy.  (App. at 5-6.)

---

[5]     Individually named Defendants include Thomas Williams, a prison counselor; Joseph Piazza, Prison Superintendent; Larry Kaskie, Unit Manager; Frank Gillis, former Superintendent; Kandis Dascani, Grievance Officer; John Sidler, Psychologist; and Sharon Burks, Chief Grievance Officer.

After reviewing Defendants' Supplemental Brief, the District Court issued an Order notifying the parties of its intent to convert the motion to dismiss into a motion for summary judgment. While the District Court's Order was electronically docketed, it is unclear if a hard copy was sent to Renchenski via the United States Postal Service or whether he actually received this notice. What is clear is that Renchenski did not file a Rule 56(f) affidavit seeking to delay disposition of the summary judgment motion while he gathered evidence in support of his opposition motion. Instead, he sought leave to file a third amended complaint. In its Order and accompanying opinion, the District Court denied Renchenski's motion to file a third amended complaint and granted summary judgment in Defendants' favor on all counts.

### 2. The District Court's Ruling

The District Court first rejected Renchenski's claim that because the SOTP required him to admit to past sexual crimes, including the sexual component of the 1982 murder, participation violated his Fifth Amendment right against self-incrimination. The District Court properly considered this claim in light of the Supreme Court's holding in *McKune v. Lile*, 536 U.S. 24 (2002), which stressed that "compulsion" was the key inquiry in any Fifth Amendment claim.[6] The District Court

---

[6] "[T]he central question becomes whether the State's program, and the consequences for nonparticipation in it, combine to create a compulsion that encumbers the constitutional right. If there is compulsion, the State cannot

10

reasoned that: (1) Pennsylvania's SOTP bore a rational relationship to the legitimate penological objective of assessing and rehabilitating inmates whose records indicate a potential problem of a sexual nature; (2) the only consequence flowing from non-participation in the program—being labeled a "possible sex offender" on an internal prison roster— does not rise to the level of compulsion; and (3) being labeled a possible sex offender does not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life.

Next, the District Court granted summary judgment in Defendants' favor on Renchenski's Fourteenth Amendment procedural due process claim. First, the District Court noted that Renchenski presented no evidence that he was forced to undergo involuntary treatment. Alternatively, the District Court held that Renchenski had neither an independent liberty interest, nor a state-created liberty interest, which triggered the need for due process protections. Because Renchenski is serving a life sentence without the possibility of parole, the District Court reasoned that refusing to participate in the SOTP would have no tangible effect on his liberty. It also rejected his argument that the stigma attached to merely labeling a prisoner a sex offender gave rise to a liberty interest.

The District Court next disposed of Renchenski's Equal Protection Clause, Sixth Amendment, and Eighth Amendment claims. First, the District Court ruled that Renchenski's equal protection claim failed because his allegations were vague and

---

continue the program in its present form . . . ." 536 U.S. at 35.

11

conclusory. Similarly, the District Court held that Renchenski could not sustain his Sixth Amendment claim because the provisions of Pennsylvania's code he cited to— 42 Pa. Cons. Stat. § 9791 *et seq.*— related to the sex offender registration laws and not to the issues raised in his complaint. Next, the District Court rejected Renchenski's Eighth Amendment claim, holding that while a cruel and unusual punishment claim may be predicated on emotional injury, Renchenski failed to establish that Defendants were aware that a substantial risk of serious harm existed and deliberately disregarded that risk. Accordingly, the District Court granted summary judgment in Defendants' favor on all counts and denied Renchenski's motion for leave to file a third amended complaint.[7] Renchenski filed a pro se appeal, and we appointed pro bono counsel.

## II.

The District Court exercised jurisdiction over Renchenski's claims under 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review

---

[7] Having disposed of the claims addressed in the Report and Recommendation, the District Court then stated its reasons for denying Renchenski's motion to file a third amended complaint. The Court concluded that amendment would be futile since the Ex Post Facto Clause claim Renchenski sought to add was meritless because participation in SOTP would not disadvantage him, and because participation in the program would not affect the legal consequences of his crime of conviction.

12

a district court's disposition of a summary judgment motion de novo. *See Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). "We apply the same standard as the District Court: Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Melrose Inc. v. City of Pittsburgh*, --- F.3d ----, 2010 WL 2814284, at *5 (3d Cir. 2010) (citation & internal quotation marks omitted). "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citation omitted). We review a district court decision refusing leave to amend a complaint pursuant to Federal Rule of Civil Procedure 15(a) for abuse of discretion. *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).

## III.

Renchenski raises several substantive challenges and one procedural challenge to the District Court's grant of summary judgment in Defendants' favor. We consider each in turn.

### 1. Constitutional Challenges

#### a. Due Process Clause Claim

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty,

13

or property, without due process of law." U.S. Const. amend. XIV, § 1. A court reviewing a procedural due process claim first determines whether the plaintiff asserts an interest protected by the Fourteenth Amendment. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). If the court concludes that such an interest exists, the next issue is whether the procedures provided to the plaintiff afforded that individual due process of law. *Id.*

### i. *Identifiable Liberty Interest*

While an inmate's constitutional rights are diminished in prison, "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974). Nonetheless, a convicted criminal's liberty interest is subject to "the nature of the regime to which [(s)he has] been lawfully committed." *Id.* at 556. "Among the historic liberties protected by the Due Process Clause is the right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." *Vitek v. Jones*, 445 U.S. 480, 492 (1980) (internal quotations & citation omitted). Nevertheless, "changes in the conditions of confinement having a substantial adverse impact on [a] prisoner are not alone sufficient to invoke the protections of the Due Process Clause as long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him." *Id.* at 493 (internal quotations & alteration omitted).

A prisoner may be deprived of a liberty interest in violation of the Constitution in two ways: (1) when severe changes in conditions of confinement amount to a grievous loss

14

that should not be imposed without the opportunity for notice and an adequate hearing, *id.* at 488; and (2) when state statutes and regulations create a liberty interest in freedom from restraint that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[,]" thereby triggering due process protection, *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Meachum v. Fano*, 427 U.S. 215, 223-27 (1976). The first is the so-called independent due process liberty interest, while the latter is the so-called state-created liberty interest.

Renchenski argues that the stigmatizing consequences of being labeled a sex offender, when coupled with mandated behavioral modification therapy, constitutes the kind of deprivation of liberty that requires procedural protections. Renchenski contends that although his conviction extinguished his right to be free from confinement, it did not authorize Pennsylvania to classify him as a sex offender without affording him additional process.

In evaluating Renchenski's argument, we are guided by the Supreme Court's decision in *Vitek*, in which the Court held that the "involuntary transfer of a . . . state prisoner [convicted of robbery] to a mental hospital implicate[d] a liberty interest that is protected by the Due Process Clause." 445 U.S. at 487. While the Court based this holding, in part, on a state-created liberty interest, it also held that the prisoner's liberty interest existed separate and apart from the state regulation. Specifically, the Court noted that the stigmatizing characterization of the prisoner as mentally ill, when coupled with the transfer to an asylum to participate in mandatory

15

behavioral therapy, "constituted a major change in the conditions of confinement amounting to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing." *Id.* at 488 (quotation marks omitted); *compare Washington v. Harper*, 494 U.S. 210 (1990) (holding that a prisoner had an independent liberty interest in being free from the arbitrary administration of psychotropic drugs), *with Meachum*, 427 U.S. at 224 (holding that the Due Process Clause does not independently create a liberty interest in prisoners to be free from intrastate prison transfers). The Court reasoned that despite the prisoner's conviction for robbery, he still "retained a residuum of liberty that would be infringed . . . without complying with minimum requirements of due process." *Vitek*, 445 U.S. at 491. In turn, the Court concluded that transfer to a mental institution was "'qualitatively different' from the punishment characteristically suffered by a person convicted of crime, and had 'stigmatizing consequences." *Sandin*, 515 U.S. at 479 n.4 (citing *Vitek*, 445 U.S. at 493-94) (quotation marks omitted). Thus, when determining an inmate's due process right "to be free from . . . unjustified intrusions on personal security[,]" *Vitek* instructs courts to consider "[c]ompelled treatment in the form of mandatory behavior modification programs[.]" 445 U.S. at 492.

Relying on *Vitek*, Renchenski argues that the District Court erred in not recognizing that the Due Process Clause independently conferred upon him a liberty interest in not being classified as a sex offender—which he argues is even more stigmatizing than being labeled as mentally ill—and forced into

16

sex offender treatment without due process.[8] We agree that only after a prisoner has been afforded due process may sex offender conditions be imposed on an inmate who has not been convicted of a sexual offense.

It is largely without question—and Defendants do not claim otherwise—that the sex offender label severely stigmatizes an individual, and that a prisoner labeled as a sex offender faces unique challenges in the prison environment. Renchenski cites to numerous sociological and criminal justice studies which conclude that sex offenders are considered "an anathema in the inmate subculture . . . [and] inmate norms call for their savage beating." Appellant's Br. at 9 (citing James E. Robertson, Sex Offenders and the Criminal Justice System 83-87 (1994)). Sexual offender inmates are also ready targets for sexual violence in prison. Indeed, studies suggest that sexual offenders' rate of sexual abuse in prison ranges from 34% to 50% higher than that of the general prison population. Appellant's Br. at 10 (citing Nancy Wolff et al., *Understanding Sexual Victimization Inside Prisons: Factors that Predict Risk*, 6 Criminology and Pub. Pol'y 535, 549 (2007)). The Ninth Circuit has stated that "[w]e can hardly conceive of a state's action bearing more stigmatizing consequences than the labeling of a prison inmate as a sex offender." *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) (internal quotation marks omitted); *see also Coleman v. Dretke*, 409 F.3d 665, 668 (5th Cir. 2005) (noting that when a state labeled an individual as a

_____

[8] Even though Pennsylvania's SOTP is based on a statute and DOC regulations, Renchenski does not argue that his due process claim stems from a state-created liberty interest.

17

sex offender, it "strongly implied" that the identified individual had committed a sex offense, "which can undoubtedly cause adverse social consequences") (internal quotation marks omitted); *Chambers v. Colorado Dep't of Corr.*, 205 F.3d 1237, 1242 (10th Cir. 2000) (noting that the sex offender label is "replete with inchoate stigmatization"). Accordingly, we agree with Renchenski that classifying him as a moderate/high risk sex offender—or even as a possible sex offender—is stigmatizing.

We also believe that the SOTP seven-step program, which consists of weekly psychotherapy sessions for approximately two years, is sufficiently similar to the forced transfer to a mental institution that the Supreme Court determined triggered a liberty interest in *Vitek*. Just as the Supreme Court reasoned that being confined to a mental institution was not within the sentence imposed on the prisoner in *Vitek,* who was incarcerated and being punished for robbery, mandating Renchenski's participation in SOTP is not within the sentence imposed since he is incarcerated for committing murder in the first degree and not for committing a sexual offense. In other words, because Renchenski was convicted of murder and his punishment is predicated upon that conviction, sex offender treatment is not one of the conditions of confinement that his sentence imposes upon him. In turn, compelled treatment, i.e., sex offender therapy, changes the conditions of Renchenski's sentence and, accordingly, constitutes a loss of liberty that exceeds his loss of freedom from confinement. *See Vitek*, 445 U.S. at 492.

We agree with the Eleventh and Fifth Circuits, which

18

have held that labeling a prisoner a sex offender and forcing him or her to submit to intensive therapy triggers a liberty interest. For example, in *Kirby v. Siegelman* the Eleventh Circuit held that Alabama's classification of inmate Edmond as a sex offender implicated a liberty interest under the Due Process Clause, and it remanded to the district court to determine whether the procedures afforded by the state satisfied the Fourteenth Amendment's requirements. 195 F.3d 1285, 1287, 1290 (11th Cir. 1999). Edmond was serving a twenty-year sentence for attempted murder, and the state classified him as a sex offender based on two prior sex-related crimes listed in his PSR. *Id.* at 1288. Edmond was not convicted of either sex crime. In fact, the grand jury did not return a true bill for the charge of rape upon which Alabama relied. *Id.* Once classified as a sex offender, Edmond was required to participate in group therapy sessions in order to be eligible for parole. *Id.*

The Eleventh Circuit concluded that the Due Process Clause gave rise to an independent liberty interest in not being labeled a sex offender and that "[a]n inmate who has never been convicted of a sex crime is entitled to due process before the state declares him to be a sex offender." *Id.* at 1292. It reasoned that branding Edmond a sex offender and forcing him to participate in behavioral modification therapy constituted a change in his confinement so severe that it exceeded the sentence imposed by the trial court. *Id.* at 1291. While the Eleventh Circuit briefly mentioned that Edmond's refusal to participate in the therapy program affected his eligibility for parole, the court did not indicate that this fact was dispositive. Rather, the Eleventh Circuit focused on the stigma associated with being labeled a sex offender, which, when coupled with

19

mandatory therapy, was sufficiently similar to *Vitek* to trigger due process protection. *Id.* at 1292.

Similarly, in *Coleman v. Dretke*, the Fifth Circuit held that requiring a prisoner to register as a sex offender and participate in therapy as a condition of supervised release triggered a liberty interest. 395 F.3d 216, 222-23 (5th Cir. 2004) (rehearing en banc denied). While on parole for burglary, Coleman was indicted for aggravated sexual assault of a minor, but pleaded guilty to misdemeanor assault. The parole panel required him to register as a sex offender and participate in behavioral modification as part of his supervised release. He was never given notice of an opportunity to contest these conditions, and when he failed to participate in therapy, his parole was revoked.

The Fifth Circuit agreed with the Eleventh Circuit in *Kirby*, and relying on *Vitek*, held that "prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions." *Id.* at 222. The court noted that in addition to the extreme stigmatization associated with being labeled a sex offender, the "state's sex offender therapy, involving intrusive and invasive behavioral modification techniques[,] is analogous to the treatment provided for in *Vitek*." *Id.* at 223. Therefore, while conceding that parolees often are required to participate in "some form of counseling . . . as a condition on their release . . . due to its highly invasive nature, [the SOTP] is qualitatively different from other conditions which may attend an inmate's release." *Id.* (quotation marks omitted). Therefore, the court ruled that

20

Coleman's liberty interest triggered procedural due process protections.

We agree with this analysis and join the Fifth and Eleventh Circuits in holding that the stigmatizing effects of being labeled a sex offender, when coupled with mandatory behavioral modification therapy, triggers an independent liberty interest emanating from the Due Process Clause of the Fourteenth Amendment.

Defendants' arguments to the contrary are unpersuasive. First, Defendants contend, and the District Court agreed, that Renchenski has not been labeled as a sex offender, but rather has been designated a "possible sex offender" whom DOC has recommended be assessed to determine whether he would benefit from participation in the SOTP. This assessment, Defendants claim, is routine and a necessary part of the rehabilitative process and prison management.[9] This argument is unconvincing for several reasons. First, Defendants cite to no evidence in the record (such as the institutional sex offender's roster which they did not include in the joint appendix)

---

[9] Defendants also argue that Renchenski's claim of stigmatization falls short because he has introduced no evidence in opposition to their motion for summary judgment demonstrating that the population at SCI-CT is aware of his status or that SCI-CT has publicized the issue. This argument is belied by the fact that the weekly therapy sessions are group therapy sessions, which comprise as many as fifteen inmates. If Renchenski were forced to participate, his categorization as a sex offender would surely be known to the prison population.

supporting their assertion that Renchenski was labeled merely as a possible sex offender. Renchenski, on the other hand, notes that DOC classified him as a "mod/high" Sex Offender. (App. at 323.) Indeed, a letter from Sidler responding to Renchenski's grievance signals DOC's intention to add sex offender status to his correctional plan. (*Id.* at 84, 92.) In any event, we discern no difference for stigmatization purposes between being labeled a sex offender and being labeled a possible sex offender.

Moreover, Defendants' assertion that the assessment Renchenski must submit to is routine and part of the rehabilitative process is belied by the DOC's own regulations. Policy 13.8.1 § 11, which, as noted, governs inmates' behavioral health care, describes the assessment process in detail. A review of this section indicates that the assessment does not determine whether or not an inmate should be classified as a sex offender—the very process Renchenski claims he is entitled to. Rather, the assessment is a tool used to ascertain the level of sex offender risk associated with each inmate in order to decide which therapy group (moderate/high or moderate/low) is most appropriate for the prisoner and to determine the risk of threat to the community. *See* Policy 13.8.1 § 11(C)(1)(c). The regulations do not indicate that a possible outcome of the assessment is a determination that the inmate should not participate in SOTP at all. Thus, once at the assessment stage, the stigma of sex offender status has already attached to the inmate.

Next, Defendants contend that because the assessment is routine, it does not constitute a significant or atypical hardship in the context of ordinary prison life. If Renchenski were a

22

convicted sex offender, this statement would ring true since Pennsylvania law requires a sex offender to participate in treatment as part of normal prison life. *See* 42 Pa. Cons. Stat. § 9718. In other words, in Pennsylvania a convicted sex offender's punishment includes participation in sex offender therapy. Here, however, Renchenski is a convicted murderer and there is no evidence suggesting that sex offender treatment is part of the punishment imposed on convicted murderers in Pennsylvania. Nor did Defendants offer evidence suggesting that all prisoners, regardless of their offense of conviction, are assessed to determine their level of sex offender risk and the appropriate sex offender treatment group. In any event, Defendants conflate the independent due process liberty interest test with the significant and atypical hardship test, which is utilized to determine whether a state-created liberty interest exists. *See Sandin*, 515 U.S. at 483-84 ("States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to . . . not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . [as opposed to a state-created liberty interest which] imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (internal citations & quotation marks omitted)). Here, Renchenski argues that his claimed liberty interest is protected by the Due Process Clause itself, which requires a showing of a severe change in conditions of confinement. Thus, whether sex offender treatment therapy is routine within Pennsylvania's prisons is immaterial.

Perhaps recognizing the fault in relying on the significant

23

and atypical hardship standard, Defendants also argue that Renchenski has failed to highlight any significant change in his conditions of confinement. They contend that participation in the SOTP would consume only a small fraction of his time in prison and therefore that the treatment is dissimilar to *Vitek,* where the inmate was physically removed to a mental institution. This argument misses the mark. While the Supreme Court in *Vitek* was certainly concerned over the physical transfer of the prisoner, they emphasized their concern was with "[c]ompelled treatment in the form of behavioral modification programs." 445 U.S. at 492. Seizing on this language, at least two of our sister circuits have also focused on the intrusive nature of behavioral modification and neither the Fifth or Eleventh Circuits required any sort of physical transfer as a prerequisite for finding a liberty interest. *See e.g.*, *Coleman*, 395 F.3d at 222-23; *Kirby*, 195 F.3d at 1292; *Neal v. Shimoda*, 131 F.3d 818, 828 (9th Cir. 1997). Therefore, while a physical transfer may be sufficient to constitute a change in a prisoner's confinement, *Vitek*, *Coleman* and *Kirby* do not stand for the proposition that a transfer is necessary for such a finding.

Defendants next argue that Renchenski's participation in the SOTP is "voluntary" and markedly different from *Vitek*, where the plaintiff was transferred to a mental hospital. We disagree. This argument is belied by the fact that according to DOC policy refusing to submit to an assessment earns Renchenski the label of a "mod/high" sex offender. In other words, if Renchenski refuses to participate, he will face the very stigmatization of being labeled a sex offender that he claims triggers constitutional protection. Additionally, prison regulations indicate that Renchenski will face punishments for

24

refusing to participate.

Moreover, we find no material difference between an inmate refusing to participate in sex offender treatment and a prisoner seeking to forestall transfer to avoid participation in mental health therapy. Unless both plaintiffs are physically dragged to therapy, both "voluntarily" refuse to participate. Furthermore, there is nothing in the Supreme Court's decision in *Vitek* indicating that the mandatory nature of the treatment at the state-run mental hospital was any different than the mandatory nature of the SOTP to which Renchenski is subject.

Likewise, while the Eleventh Circuit in *Kirby* noted that the plaintiff's refusal to participate in the SOTP impacted his eligibility for parole, that opinion focused and was predicated on stigma combined with compelled therapy. And while the Fifth Circuit in *Coleman* also noted the effect non-participation had on the plaintiff's parole, the court rejected the notion that the prisoner enjoyed a state-created liberty interest and focused instead on the stigma and intrusive nature of behavioral modification therapy. *But see Neal*, 131 F.3d at 827-29 (holding in the state-created liberty interest context that while participation in Hawaii's sex offender therapy was technically voluntary, because refusing to participate rendered an inmate completely ineligible for parole, the "coercive component of the SOTP [was] functionally equivalent to the psychiatric treatment required by the statute at issue in *Vitek*"). The Fifth Circuit went even further and distinguished sex offender treatment from other therapy programs offered and mandated by Texas' prisons because of the highly stigmatizing and intrusive nature of sex offender therapy. 395 F.3d at 224.

25

The Seventh Circuit's decision in *Grennier v. Frank*, 453 F.3d 442 (7th Cir. 2006) does not alter this analysis. In *Grennier*, the court held that the stigmatization of being called a sex offender and being denied parole on that basis does not implicate due process. *Grennier* does not inform our decision since it involved a claim of a state-created liberty interest, which Renchenski does not assert is the basis for his liberty interest. Additionally, we disagree with the Seventh Circuit's interpretations of *Kirby* and *Coleman* as being predicated solely upon the fact that prisoners must participate in the SOTP in order to be eligible for parole. Unlike in *Neal*, where eligibility for parole was a dispositive factor, the Fifth and Eleventh Circuits' decisions were grounded in stigmatization coupled with "some other tangible element", i.e., mandated sex offender treatment therapy. *See Coleman*, 395 F.3d at 223 n.26.

We recognize that prisons have a strong interest in enrolling their inmates in various rehabilitative programs and that prison administrators are in the best position to exercise discretion in administering those programs. We agree with Renchenski, however, that he has an independent liberty interest in not being labeled a sex offender, which results in mandatory sex offender therapy as part of a prescriptive correctional plan. The Fourteenth Amendment therefore entitles Renchenski to adequate process before Defendants can take this action.

### ii. *Adequate Procedure*

Having determined that Renchenski has a due process liberty interest in not being labeled a sex offender and forced into treatment, we turn to what process will satisfy the

26

Fourteenth Amendment. "When protected interests are implicated, the right to some kind of prior hearing is paramount. . . . [A] weighing process has long been a part of any determination of the form of hearing required in particular situations by procedural due process." *Neal*, 131 F.3d at 830 (quoting *Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 569-70 (1972)) (emphasis omitted). Because Renchenski was never charged with, nor convicted of, a sex offense, the procedure he was afforded during his trial and conviction for the 1982 murder cannot serve as the sufficient procedural safeguard for Fourteenth Amendment purposes. Nor has he been afforded the opportunity to properly challenge his sex offender classification. *See Coleman*, 395 F.3d at 221.

Given Renchenski's first degree murder conviction and the strong State interest in administering rehabilitative programs and maintaining order within the prison, however, Defendants need not commence "a new adversary criminal trial" before labeling Renchenski a sex offender and recommending him for therapy. *Morrissey v. Brewer*, 408 U.S. 471, 483 (1972). Rather, the Fourteenth Amendment entitles him to minimum procedures which will result in "an effective but informal hearing." *Id.* at 485. These include: (1) written notice to Renchenski that Defendants are considering classifying him as a sex offender and mandating his participation in SOTP; (2) a hearing, held sufficiently after the notice to permit Renchenski to prepare, which includes: disclosure of the evidence Defendants would rely upon for the classification, and an opportunity for Renchenski to be heard in person and to present documentary evidence; (3) an opportunity to present witness testimony and to confront and cross-examine witnesses called by

27

Defendants, "except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination"; (4) administration of the hearing by an independent decisionmaker; (5) rendering of a written statement by the decisionmaker as to the evidence relied on and the reasons for Renchenski's classification; and (6) "[e]ffective and timely notice of all the foregoing rights." *Vitek*, 445 U.S. at 494-95 (citation omitted).[10] "[T]he process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Morrissey*, 408 U.S. at 489.

For the foregoing reasons, we reverse the District Court's grant of summary judgment in Defendants' favor and remand this case to the District Court for further proceedings consistent with this opinion.[11]

---

[10] We do not hold that due process requires the State to appoint Renchenski counsel at this hearing.

[11] The District Court did not address, and the parties did not raise in their appellate briefs, issues of qualified immunity or the appropriateness of monetary damages. Nor was the important question of the allocation of the burden of persuasion, or the extent of Defendants' evidentiary burden, adequately presented to the District Court. *See E.B. v. Verniero*, 119 F.3d 1077 (3d Cir. 1997). We express no opinion on these issues and trust that the District Court will address them on remand.

28

### b. Fifth Amendment Claim

Assuming, *arguendo*, that after a constitutionally sound administrative hearing Defendants determine he is subject to sex offender treatment, Renchenski claims that dubbing him a sex offender and mandating participation in the SOTP would violate his Fifth Amendment right against self-incrimination. The Fifth Amendment, incorporated and made applicable to the states through the Fourteenth Amendment, prevents a state from compelling a person to incriminate himself or herself. U.S. Const. amend. V (providing that no person "shall be compelled in any criminal case to be a witness against himself"). While the "privilege against self-incrimination does not terminate at the jailhouse door . . . [a] broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction." *McKune v. Lile*, 536 U.S. 24, 36 (2002). The Fifth Amendment right against self-incrimination applies not only in criminal trials, but whenever the state seeks to compel an individual to be a witness against himself or herself and divulge information that might incriminate that person in future criminal proceedings. *See Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).

The Supreme Court outlined the contours of a prisoner's Fifth Amendment right against self-incrimination in *McKune*, which involved a convicted sex offender's challenge to Kansas' compulsory sex offender program and required him to admit his crime of incarceration, as well as any other past sex crimes. 536 U.S. at 29. The information revealed by a prisoner during the sexual abuse treatment program was not privileged, Kansas

29

reserved the right to use that information in future criminal proceedings, and it tested the veracity of the prisoner's admissions with a polygraph. *Id.* at 30. Lile, the state prisoner-plaintiff, was informed that if he refused to participate in treatment, his privilege status would be reduced from Level III to Level I, resulting in the curtailment of his visitation rights, earnings, work opportunities, ability to send money to his family, and other privileges. *Id.* at 31. Lile would also be transferred to a maximum-security prison where his movement would be limited, where he would be placed in a four-person (instead of a two-person) cell, and where he would be surrounded by more dangerous criminals. *Id.* Lile filed a Fifth Amendment challenge to the compulsory sex offender therapy based on the fact that incriminating statements made during counseling were not privileged. Lile also argued that the purported punishments he faced if he refused to participate were sufficiently coercive as to constitute a violation of the right against self-incrimination.

A plurality of the Supreme Court rejected this argument. Before finding it necessary to address the issues of privilege and immunity that Lile asserted rendered his participation in the sex offender therapy program a Fifth Amendment violation, the Court instructed that compulsion was the linchpin, since the initial and "central question [was] whether the State's program, and the consequences for non-participation in it, combine to create a compulsion that encumber[ed] [the prisoner's Fifth Amendment rights.]" *Id.* at 35. Referencing *Sandin*, the plurality held that a "prison clinical rehabilitation program . . . does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are

30

related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." *Id.* at 37-38. Turning to Lile's case, the Court noted that refusing to participate in sexual abuse treatment did not extend his term of incarceration, or affect his eligibility for good time credits or parole. *Id.* at 38. The Court also reasoned that the move to a maximum-security prison was not intended to punish Lile, but to make beds available to other inmates willing to participate in the program. *Id.* Finally, the plurality defined the consequences of Lile's reduction to Level I not as punishments, but as "incentives to behave," and reasoned that the "Constitution accords prison officials wide latitude to bestow or revoke these perquisites as they see fit." *Id.* at 39. Perquisites, the Court said, merely made prison life more tolerable. *Id.* at 42. Thus, the Court directed lower courts to "decide whether the consequences of an inmate's choice to remain silent are closer to the physical torture against which the Constitution clearly protects or the de minimis harms against which it does not." *Id.* at 41. Because the consequences of Lile's refusal were de minimis, the Court ruled that his choice, though not voluntary in the colloquial sense, did not amount to compulsion. *Id.* at 44.

Justice O'Connor concurred with the plurality's judgment, but explicitly rejected the plurality's atypical and significant hardship standard, agreeing with the Stevens' plurality that the compulsion standard was broader than the test outlined in *Sandin*. *Id.* at 48-49. She concurred in the judgment, however, because she felt that the alterations in Lile's prison conditions resulting from his refusal to participate in treatment did not constitute compulsion since "[n]ot all pressure

31

necessarily compels incriminating statements." *Id.* (alteration in original). Justice O'Connor cited some of the penalties the Court previously had identified as so great as to constitute compulsion. These included termination of employment, loss of professional license, inability to receive government contracts, and inability to hold public office. *Id.* at 49-50 (citations omitted). These were "grave" consequences, whereas the consequences Lile faced were minor. Justice O'Connor, however, explicitly rejected the portion of Justice Stevens' plurality opinion that reasoned that because the penalties for refusal to participate were the same penalties levied against prisoners for disciplinary violations, the punishments constituted compulsion. To the contrary, she noted that there "is a difference between the sorts of penalties that would give a prisoner a reason not to violate prison disciplinary rules and what would compel him to expose himself to criminal liability." *Id.* at 52.

Relying on *McKune*, Renchenski contends that the penalties for refusing to participate in the SOTP rise to the level of compulsion and therefore violate his Fifth Amendment right against self-incrimination.[12] He contends that the District Court incorrectly focused on the plurality's atypical and significant hardship test, which requires a heightened showing to establish compulsion compared to the more modest showing required by Justice O'Connor's concurrence. Renchenski also argues that the District Court erred when it held that the only consequences

---

[12]    Like Kansas' treatment program, Pennsylvania's program requires participants to admit to all past crimes and offers no privilege for those confessions.

32

of refusing to participate are that his name would be listed on the offender's roster as a "possible sex offender."

Even though Renchenski is correct that Justice O'Connor's concurrence controls, his Fifth Amendment claim nevertheless fails because the consequences he faces for refusing to participate in the SOTP do not rise to the level of compulsion even under Justice O'Connor's narrower standard. *See United States v. Naranjo*, 426 F.3d 221, 231 (3d Cir. 2005) (noting that when "no one view garners a majority of the Justices . . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds") (internal quotation marks & citation omitted). Renchenski's attempt to classify the consequences he faces as more severe than the consequences at issue in *McKune* is unpersuasive.

Renchenski first notes that his refusal to participate in sex offender treatment—a Class I violation—may result in loss of his prison job. While the Supreme Court has recognized that loss of livelihood amounts to compulsion, it has not done so in the prison context. To the contrary, in her concurrence, Justice O'Connor noted that a reduction in prison wages did not constitute compulsion because the "prison is responsible for caring for respondent's basic needs, [and therefore] his ability to support himself is not implicated by the reduction in wages he would suffer as a result." *McKune*, 536 U.S. at 51. This logic is equally applicable to loss of a prison job. Even if Renchenski lost his only source of income, the DOC would still provide him with food, shelter and access to medical care.

33

Renchenski counters that "[b]ecause he requires the income from his prison job to pursue the appeal of his conviction, loss of that job condemns him to remain in prison." Appellant's Br. at 38. This argument is entirely unpersuasive. Renchenski remains in prison because a jury of his peers convicted him of first degree murder and the likelihood of prevailing in a collateral attack on his 1984 conviction is far too remote to constitute a basic need for Fifth Amendment purposes. *See United States v. Hollis*, 569 F.2d 199, 205-06 (3d Cir. 1977) (noting the strong presumption that the judgments of state criminal courts are valid). Indeed, in January 2010, the Pennsylvania Superior Court dismissed Renchenski's petition for post-conviction relief, ruling that while his initial petition was timely, his decade-plus delay in pursuing his collateral attack constituted abandonment of his claim, and that Renchenski's "failure to pursue his PCRA petition has now created a situation where the Commonwealth would be severely prejudiced were it required to retry the case." *Commonwealth v. Renchenski*, 988 A.2d 699, 703 (Pa. Super. Ct. 2010). Renchenski has not appealed this ruling. Simply put, his case is closed. Furthermore, we do not think that Renchenski's desire to pursue a collateral attack on his 1984 conviction with wages earned from his prison job constitutes a "basic need" for Fifth Amendment purposes.

Nor do any of the other consequences Renchenski faces for refusal to participate in the SOTP rise to the requisite level of compulsion. Prison regulations list the following outcomes for failure to participate in the SOTP: assignment to disciplinary custody for ninety days, cell restriction for thirty days, suspension of the right to receive visitors, and loss of privileges

34

such as access to television, radio and the commissary. *See* DC-ADM, 801, Inmate Disciplinary Procedures Manual § 4. (App. at 500-01.) As noted above, in *McKune* at least five Justices rejected the argument that loss of privileges, such as access to television and radio, as well as suspension of the right to receive visitors, constituted compulsion for Fifth Amendment purposes.

Furthermore, these "punishments" are the same consequences inmates face for a variety of infractions. In addition to refusing to attend mandatory rehabilitative correctional programs, Class I charges encompass refusing to obey an order, violating visiting regulations, failing to report contraband, etc. (App. at 517.) The consequences for committing any of these infractions are the same. In other words, Renchenski's refusal to participate in SOTP may result in the same consequence as another inmate's failure to stand for count or refusal to participate in a drug treatment program. This is significant because in her *McKune* concurrence, Justice O'Connor specifically rejected Justice Stevens' conclusion that because "the penalties facing [Lile] for refusal to incriminate himself are the same as those imposed for prison disciplinary violations . . . they are coercive." 536 U.S. at 51. Here, Renchenski merely confronts the same penalties that his peers who commit any of the numerous enumerated Class I disciplinary violations face.

Moreover, in *McKune* Justice O'Connor rejected Lile's suggestion that transferring him to a maximum-security prison—a more dangerous prison—amounted to punishment. Here, Renchenski may be sent to disciplinary custody or placed

on cell restriction. While this penalty will undoubtedly inconvenience and isolate Renchenski, it is a far less serious consequence than transferring a prisoner from a medium-to a maximum-security prison, which the Supreme Court previously found did not rise to the level of compulsion.

In short, loss of his prison job and other consequences that flow from his refusal to participate in the SOTP do not rise to the level of compulsion which would compel Renchenski to expose himself to criminal liability. Therefore, we affirm the District Court's grant of summary judgment in Defendants' favor on Renchenski's Fifth Amendment claim.

### c. Remaining Constitutional Claims

Renchenski next contends that classifying him as a sex offender when he was never charged with, nor convicted of, a sex offense violates his Sixth Amendment right to trial by jury. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. [The Supreme Court has] held that these provisions require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (quotation marks & citation omitted). Because he was found guilty of murder in the first degree under Pennsylvania law, and not with a crime that contains a sexual element, Renchenski claims that labeling him a sex offender and mandating his participation in behavioral modification therapy violates the Sixth Amendment.

36

Renchenski cites to Supreme Court cases that stand for the broad proposition that an individual accused of a crime may be found guilty based only on proof beyond a reasonable doubt of each element of the crime. *See In re Winship*, 397 U.S. 358, 359 (1970) (holding that "proof beyond a reasonable doubt is among the essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult.") (internal quotation marks omitted); *Cole v. Arkansas*, 333 U.S. 196 (1948) (holding that the charging document must give the defendant notice of the elements of the charged crime). His reliance on these cases, however, is misplaced since they all involved criminal proceedings. *See United States v. Zucker*, 161 U.S. 475, 481 (1896) (noting that the Sixth Amendment is limited to criminal proceedings); *Hannah v. Larche,* 363 U.S. 420, 440 n.16 (1960) (affirming that Sixth Amendment protections apply only during criminal proceedings). Because Pennsylvania's SOTP is not a criminal proceeding, the Sixth Amendment is not implicated. Here, Defendants did not charge Renchenski with rape and adjudge him guilty of the crime. Rather, they evaluated his file and determined—albeit without the protections of due process—that the nature of his crime made him a candidate for sexual offender treatment.

Similarly, Renchenski's reliance on *Jenkins v. McKetihen*, 395 U.S. 411 (1969) is misplaced. *Jenkins* involved a challenge to Louisiana's Labor Management Commission of Inquiry, which was tasked with investigating alleged violations of state and federal labor law. Its purpose was to recommend to the governor whether there was probable cause to believe that an individual or organization had violated criminal laws. The

37

Commission had the power to subpoena witnesses, but the target of the investigation could not call witnesses. The Supreme Court held that the Commission violated the Fourteenth Amendment because the Commission "exercises a function very much akin to making an official adjudication of criminal culpability." *Id.* at 427. The Court went on to note that:

> In the present context, where the Commission allegedly makes an actual finding that a specific individual is guilty of a crime, we think that due process requires the Commission to afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights.

*Id.* at 429. Unlike the Commission in *Jenkins*, here Defendants are not accusing Renchenski of a new crime and making culpability judgments. Nor are Defendants concerned with exposing violations of criminal law. *Id.* at 428. Rather, they are focused on ensuring that sexual deviants receive the appropriate treatment to minimize the risk of future offense and to create a safer environment within the prison.

Renchenski's case is more akin to *Hannah v. Larche*, 363 U.S. 420 (1960), a case in which the Civil Rights Commission survived a due process challenge. The Civil Rights Commission was tasked with investigating allegations of voter suppression. Targets of the Commission challenged its constitutionality on due process grounds, arguing that they were entitled: (1) to notice of the nature of the charges against them; (2) to know the identity of the complainants; (3) and to cross-examine their

38

accusers. The Supreme Court rejected these arguments, holding that the Commission "does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property." *Id.* at 441. Similarly here, Defendants are not adjudicating Renchenski guilty of rape; nor are they extending his sentence or determining civil liability. Rather, they are classifying him as a prisoner who, because of the nature of his crime, would benefit from sexual offender therapy. And although, as noted above, Defendants' actions do implicate Renchenski's liberty interest, this constitutional violation can be cured by affording him the appropriate due process. The liberty interest, however, does not give rise to a Sixth Amendment claim and certainly does not transform Pennsylvania's correctional plans into criminal proceedings. Therefore, we affirm the District Court's grant of Defendants' motion for summary judgment based on Renchenski's Sixth Amendment claim.

The District Court also properly held that Defendants were entitled to summary judgment on Renchenski's equal protection claim. The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003).

39

> If state action does not burden a fundamental
> Constitutional right or target a suspect class, the
> challenged classification must be upheld if there
> is any reasonably conceivable state of facts that
> could provide a rational basis for the
> classification. If the challenged state action
> involves a suspect classification based on race,
> alienage or national origin, or infringes on a
> fundamental constitutional right, we must apply
> the strict scrutiny standard.

*Doe v. Pennsylvania Bd. of Prob. and Parole*, 513 F.3d 95, 107 (3d Cir. 2008) (internal quotation marks & citations omitted).

In his Amended Complaint, Renchenski accused Defendants of not providing him with "Equal Protection of the Law by ignoring State and Federal laws while sanctioning the plaintiff as a sex offender without adhering to procedural safeguards provided for by the law." (App. at 75.) Although we are mindful that pro se complaints are to be construed liberally, *see Giles*, 571 F.3d at 322, we nevertheless affirm the District Court's ruling that Defendants are entitled to summary judgment on Renchenski's equal protection claim. Renchenski did not allege, nor raise a material issue of fact demonstrating that Defendants treated him differently because he is a member of a suspect class or because he exercised a fundamental right. *See City of Cleburn v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

Nor can Renchenski maintain an equal protection claim based on the "class of one" theory of liability outlined by the

40

Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). In *Olech*, the Court permitted a plaintiff to proceed on a class of one theory when the plaintiff alleged that she had been "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Id.* at 564; *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008). Here Renchenski argues that "the state has created a suspect 'class of one' into which [Renchenski] has been placed . . . [and that] there are no 'similarly situated' individuals due to [Renchenski] having no sex offense history." Appellant's Reply Br. I at 17. His claim fails because he has adduced no evidence of unequal treatment, and in order to forestall summary judgment, Renchenski must bring forth enough evidence from which a reasonable jury could find in his favor. Here, he makes mere conclusory allegations. And these allegations, even if accepted as true, fall short. He does not allege, for example, that he is the only inmate in SCI-CT who, though not charged or convicted of a sex offense, was nonetheless labeled a sex offender based on a history of abusive sexual behavior and recommended to sex offender therapy. Therefore, the District Court properly granted summary judgment in Defendants' favor on Renchenski's Equal Protection Clause claim.

Similarly, Defendants are entitled to summary judgment on Renchenski's Eighth Amendment claim. The Eighth Amendment "prohibits punishment which violate[s] civilized standards of humanity and decency." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997) (citation omitted). To prove a violation of the Eighth Amendment, a plaintiff must demonstrate that prison conditions deprived him of life's minimum

41

necessities, that the deprivation was sufficiently serious, and that "a prison official acted with deliberate indifference in subjecting him to that deprivation." *Id.* Prison "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Union Cnty. Jail Inmates v. Di Buono*, 713 F.2d 984, 997 (3d Cir. 1983) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Renchenski presents no evidence that he was denied food, water, clothing, shelter, sanitation, or medical care. Rather, he argues that the Defendants' actions caused him "extreme stress and anxiety." (App. at 75.) We have held that "[e]motional distress can produce injury of the same severe magnitude as occurred in the cases of physical harm and withholding necessary medical care, and it can be inflicted in the same wanton and unreasonable manner." *Rhodes v. Robinson*, 612 F.2d 766, 772 (3d Cir. 1979). To succeed on an Eighth Amendment claim predicated on emotional distress, however, we also require that the defendant's wanton and unnecessary infliction of emotional harm include an improper state of mind. *Id.* "Where a person suffers injury as an incidental and unintended consequence of official actions, the abuse of power contemplated in the due process and Eighth Amendment cases does not arise." *Id.* Renchenski's complaint lacks any allegation that Defendants acted with the requisite culpability necessary to finding an Eighth Amendment violation. Rather, the stress Renchenski suffered was incidental to Defendants' official actions. While we do not doubt being labeled a sex offender caused Renchenski stress and anxiety, dubbing him a sex offender and mandating behavioral modification therapy

42

does not constitute a deprivation of any basic human need. Accordingly, the District Court properly entered summary judgment in Defendants' favor on Renchenski's Eighth Amendment claim.

### 2.    Procedural Challenge

Although we reverse the entry of summary judgment as to Renchenski's Fourteenth Amendment claim and affirm the District Court's Order in all other respects, we pause here to briefly address Renchenski's argument that the District Court improperly converted Defendants' motion to dismiss into a motion for summary judgment without permitting him leave to take discovery.

Federal Rule of Civil Procedure 56(f) provides that a party opposing a motion for summary judgment may file an affidavit asking the court to stay its decision while he or she conducts discovery to ascertain facts essential to justifying his or her opposition. Renchenski maintains that the District Court should have stayed its disposition of the converted motion for summary judgment and afforded him the opportunity to take discovery on: (1) the consequences he may have been subject to for refusal to participate in the SOTP; (2) Pennsylvania's application of the sex offender label to prisoners never convicted of a sex offense; (3) the SOTP's nature and details; (4) Renchenski's PSR and the coroner's report; and (5) Renchenski's classification on the sex offender roster. While he did not file a formal Rule 56(f) affidavit, in his opposition to Defendant's Supplemental Brief, Renchenski clearly addressed the difficulty of disputing the DOC's asserted facts because he

had not yet been allowed discovery. (App. at 372 ("The plaintiff has thus far been denied any type of discovery materials and it is impossible for him to view, challenge, or verify that those Standards and Practices [of the SOTP] are indeed written as the defendants claim, and that the defendants are in fact following them.")).[13]

Although we review the District Court's refusal to delay its ruling on Defendants' summary judgment motion under the deferential abuse of discretion standard, we remain concerned over the District Court's disposition of this case. We have held that while "it would be desirable in the interest of clarity for an order to expressly notify the parties that the court was converting a motion to dismiss into one of summary judgment or that the ruling would be pursuant to Rule 56, the court need not be so explicit so long as the order otherwise fairly apprises the parties of the proposed conversion." *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989) (citations and & quotation marks omitted).[14]  Here, the Order noted that the District Court

---

[13] At the time the District Court ordered Defendants to file a supplemental brief to satisfy its concern over potentially legally significant material facts, and before the District Court converted Defendants' motion to dismiss into a motion for summary judgment, Renchenski's discovery request was pending.

[14] We do not know whether the District Court sent Renchenski a paper copy of its June 6, 2007 Order giving notice of its intent to convert Defendants' motion to dismiss into a motion for summary judgment.

44

intended to rely on matters outside of the pleadings in its ruling, and correctly stated that notice of the conversion and an opportunity to respond are required. Nevertheless, we are concerned that the notice may have been inadequate because the Court never informed Renchenski of Rule 56's requirements, his need to file a Rule 56(f) affidavit to forestall Defendants' motion for summary judgment, or of the consequences for his failure to do so. *Cf. Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992) (holding that the district court abused its discretion in converting a motion to dismiss into a summary judgment motion when the court did not inform the pro se prisoner of the consequences of failing to file a Rule 56(e) affidavit); *Lewis v. Faulkner*, 689 F.2d 100, 101 (7th Cir. 1982) (same).

In *Kelly*, the district court converted the defendants' motion for dismissal into a motion for summary judgment without informing the pro se prisoner that the court was treating the defendants' motion pursuant to Rule 56. Holding that the district court prematurely disposed of the summary judgment motion, the D.C. Circuit reasoned that:

> A district court cannot properly act on a motion for summary judgment without giving the opposing party a reasonable opportunity to submit affidavits that contradict the affidavits submitted in support of the motion and demonstrate that there is a genuine issue of material fact. . . . [R]easonable opportunity presupposes notice. . . . [M]ere time is not enough, if knowledge of the consequences of not making use of it is wanting.

45

963 F.2d at 456 (citation & quotation marks omitted). The D.C. Circuit further concluded that in order for notice to be adequate, it must explain the consequences of a Rule 56 motion and the effect of a failure to file a Rule 56(e) affidavit in opposition, which are particularly important in the pro se prisoner context. *Id.* Thus, the D.C. Circuit noted, in dicta, that incarcerating governmental defendants should assist district courts in providing proper notice to prisoner pro se plaintiffs by including in their motions for summary judgment a plain statement that any factual assertions in the movant's affidavits will be accepted by the district court as true unless the plaintiff submits his or her own affidavit or documentary evidence contradicting the assertions. The D.C. Circuit also required that Rule 56's text be sent to the prisoner-plaintiff in addition to a short and plain statement summarizing the appropriate portion of Rule 56. When the government failed to provide such notice, the court placed the burden on the district court to send proper notice to the prisoner-plaintiff. Several other circuits have taken a similar view and have required district courts and governmental defendants to inform pro se prisoner-plaintiffs of the contours of Rule 56 and of the specific consequences for failure to submit an opposing affidavit. *See generally Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *Brown v. Shinbaum*, 828 F.2d 707, 708 (11th Cir. 1987); *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982); *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975); *but see Martin v. Harrison County Jail*, 975 F.2d 192 (5th Cir. 1992); *Brock v. Hendershott*, 840 F.2d 339, 343 (6th Cir. 1987) (holding no additional procedure beyond that outlined in Rule 56 is necessary in the non-prisoner pro se context); *Jacobsen v. Filler*, 790 F.2d 1362, 1364-67 (9th Cir. 1986) (same).

46

We agree with the majority of our sister circuits that adequate notice in the pro se prisoner context includes providing a prisoner-plaintiff with a paper copy of the conversion Order, as well as a copy of Rule 56 and a short summary explaining its import that highlights the utility of a Rule 56(f) affidavit.[15] While we are mindful that this extra requirement imposes some burden upon the district courts as well as governmental defendants, we believe this burden is slight especially since generic language can be readily compiled and disseminated as needed. We therefore trust that in the future, the State and Federal Governments, as well as our district courts, will work together to ensure pro se prisoner-plaintiffs receive adequate notice of an imminent motion for summary judgment.

"The failure to give adequate notice does not, however, require automatic reversal; it may be excused if the failure was a harmless error. Thus, [a] judgment may be affirmed if it appears that there is no set of facts on which plaintiffs could possibly recover." *Rose*, 871 F.2d at 342 (internal quotation marks & citations omitted). As noted above, there are no set of facts on which Renchenski could recover on his Fifth Amendment, Sixth Amendment, Eighth Amendment or equal protection claims. Therefore, the District Court's conversion of Defendants' motion to dismiss into one for summary judgment and disposition of the case before Renchenski had proper notice to respond was harmless.

---

[15] In our view, the reasons for providing adequate notice to incarcerated plaintiffs in the Rule 56(e) context apply with equal force to Rule 56(f).

**IV.**

For the foregoing reasons, we will reverse the District Court's grant of summary judgment in Defendants' favor as to Renchenski's Due Process Clause claim. In all other respects, we affirm the District Court's Order.