ANTHONY A. *v.* COMMISSIONER OF CORRECTION*
(SC 20499)

Robinson, C. J., and McDonald, Kahn, Ecker and Keller, Js.

*Syllabus*

The petitioner sought a writ of habeas corpus, claiming, inter alia, that the
Department of Correction violated his constitutional rights to procedural
due process in assigning him a certain sex treatment need score and
to substantive due process in classifying him as a sex offender, even
though he never had committed or been convicted of a sex offense. The
petitioner had been convicted of unlawful restraint in the first degree
and failure to appear, and had been found to be in violation of probation.
Prior to the petitioner's incarceration, the state entered a nolle prosequi
as to a charge of sexual assault in a spousal relationship after the
petitioner's wife, M, recanted her statement to the police that the peti-
tioner had sexually assaulted her during the same incident that formed
the basis for the charges of which he was convicted. Following his
release from incarceration, the petitioner pleaded guilty to new charges
stemming from another incident and was sentenced to concurrent terms
of incarceration. Upon his return to prison, the petitioner was notified
that a classification hearing would be held to determine whether, on
the basis of the prior charge of sexual assault in a spousal relationship,
he would be assigned a sex treatment need score of greater than 1 and
that, in making its determination, the department would be relying on
the police report of the petitioner's arrest and the petitioner's Connecti-
cut rap sheets. Prior to the hearing, the department denied the petition-
er's requests that, at his hearing, he be permitted to present live witness
testimony and to be represented by counsel. During the hearing, the
petitioner denied sexually assaulting M and submitted several docu-
ments, including M's letter recanting her statement to the police, in
support of his denial. Following the hearing, the hearing officer, T,
notified the petitioner that she had assigned him a sex treatment need
score of 3, that, in arriving at her decision, she reviewed not only the
record concerning the earlier incident that led to the charge of sexual
assault in a spousal relationship but also his complete Connecticut
criminal record, including numerous corresponding police reports and
arrest warrant applications, and that her supervisor, D, had reviewed
and approved the petitioner's assigned sex treatment need score. There-
after, the petitioner appealed, challenging the assigned score, and T and

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we
decline to identify any party protected or sought to be protected under a
protective order or a restraining order that was issued or applied for, or
others through whom that party's identity may be ascertained.

Anthony A. *v.* Commissioner of Correction

D denied the appeal after discussing it briefly. As a result of his sex treatment need score, the petitioner could not be placed in a correctional facility lower than level three without authorization from the respondent, the Commissioner of Correction, which rendered him ineligible for a veterans program available only at a level two facility. He also was referred to the department's sex treatment program staff for an evaluation, but he refused to participate in the evaluation on the ground that the department had incorrectly classified him as a sex offender. In addition, the petitioner refused to sign his offender accountability plan, which resulted in his forfeiture of twenty-five days of earned risk reduction credit and his being barred from earning additional credit until he signed the plan, and it negatively impacted his eligibility for parole and community release. The habeas court rendered judgment denying the petitioner's habeas petition. With respect to the petitioner's procedural due process claim, the habeas court, applying the standard set forth in *Wolff* v. *McDonnell* (418 U.S. 539), considered and rejected each of the petitioner's contentions regarding the inadequacy of the process he was provided prior to being classified as a sex offender. The court also rejected the petitioner's claims that the sex offender classification violated his right to substantive due process and that his sex treatment need score constituted punishment not clearly warranted by law in violation of article first, § 9, of the Connecticut constitution. On the granting of certification, the petitioner appealed from the habeas court's judgment. *Held*:

1. The department violated the petitioner's constitutional right to procedural due process in classifying him as a sex offender, the petitioner not having been afforded all of the procedural protections required by *Wolff*: the petitioner was not provided an opportunity to call witnesses in his defense, as the department denied his request to call witnesses without knowing who the witnesses were or what they would say, or considering whether their presence would be unduly hazardous to institutional safety or correctional goals, and, under *Wolff*, in the absence of a showing by the department that the presence at the prison of the witnesses whom the petitioner planned to call would have been unduly hazardous to institutional safety concerns, the petitioner should have been permitted to call those witnesses; moreover, the petitioner was not provided adequate notice of the information on which department personnel would rely in determining his classification, as T conducted additional research after the classification hearing had concluded into the petitioner's criminal record, which included reviewing all of the petitioner's arrest records, in order to assess the reliability of M's recantation but never notified the petitioner that the facts of his past arrests would be used against him, and, under *Wolff*, the petitioner was entitled to this information to allow him an opportunity to marshal the facts in his defense, and the department did not satisfy the notice requirements of *Wolff* by notifying the petitioner that his Connecticut rap sheets would be reviewed as

Anthony A. *v.* Commissioner of Correction

part of the decision-making process; furthermore, the petitioner was not afforded an impartial decision maker to rule on his administrative appeal insofar as T and D ruled on that appeal from their own initial classification decision, and, although the petitioner was denied due process of law because of the manner in which the department conducted the classification hearing, this court concluded that there was sufficient evidence in the record to support the petitioner's classification as a sex offender in light of M's detailed statement to the police describing the petitioner's sexual misconduct and the petitioner's own statement to the police, which corroborated some of M's account of the incident.

2. The petitioner could not prevail on his claim that the habeas court incorrectly concluded that the department had not violated his state constitutional right to substantive due process by classifying him as a sex offender: contrary to the petitioner's argument, there was no evidence that the petitioner was classified as a sex offender on the basis of mental disability or psychiatric illness, and, therefore, because the petitioner was classified on the basis of neutral considerations that did not target a suspect class, his claim was subject to rational basis review rather than strict scrutiny; moreover, the petitioner's contention that the department's classification decision could not withstand rational basis review was unavailing, as the department's interests in effective population management and rehabilitation were both legitimate and rationally related to its classification policy and procedure, and the department's policy and process for classifying the petitioner as a sex offender did not come close to shocking the conscience.

3. The petitioner's classification as a sex offender on the basis of nonconviction information violated article first, § 9, of the Connecticut constitution, as the petitioner was not afforded the full panoply of the procedural protections set forth in *Wolff* prior to receiving that classification; accordingly, the habeas court's judgment was reversed, and the case was remanded with direction to issue a writ of habeas corpus and to direct the respondent to expunge the petitioner's sex treatment need score.

Argued December 10, 2020—officially released June 17, 2021**

*Procedural History*

Petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the court, *Sferrazza, J.*, rendered judgment dismissing the petition, from which the petitioner, on the granting of certification, appealed to the Appellate Court, *Alvord, Sheldon* and *Norcott, Js.*, which reversed the habeas

** June 17, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Anthony A. *v.* Commissioner of Correction

court's judgment and remanded the case for further proceedings, and the respondent, on the granting of certification, appealed to this court, which affirmed the Appellate Court's judgment; thereafter, the petitioner filed an amended petition for a writ of habeas corpus, and the case was tried to the court, *Kwak, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed. *Reversed*; *judgment directed.*

*Vishal K. Garg*, for the appellant (petitioner).

*Zenobia G. Graham-Days*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Clare E. Kindall*, solicitor general, for the appellee (respondent).

*Opinion*

KELLER, J. In *Anthony A.* v. *Commissioner of Correction*, 326 Conn. 668, 166 A.3d 614 (2017) (*Anthony A. II*), this court affirmed the judgment of the Appellate Court, which concluded that the petitioner, Anthony A., had a protected liberty interest in not being incorrectly classified by the Department of Correction (department) as a sex offender for purposes of determining the petitioner's housing, security and treatment needs within the department.[1] Id., 674. Because the due pro-

---

[1] As a general matter, inmate "[c]lassification . . . does not involve deprivation of a liberty interest independently protected by the [d]ue [p]rocess [c]lause." *Bailey* v. *Shillinger*, 828 F.2d 651, 652 (10th Cir. 1987). Courts uniformly have held, however, that "an inmate who has not previously been convicted of a sex offense may be classified as a sex offender for purposes of a prison treatment program only if the prison affords him the procedural protections to which prisoners facing disciplinary sanctions involving liberty interests are generally entitled." *Gwinn* v. *Awmiller*, 354 F.3d 1211, 1218 (10th Cir.), cert. denied, 543 U.S. 860, 125 S. Ct. 181, 160 L. Ed. 2d 100 (2004); see also *Coleman* v. *Dretke*, 395 F.3d 216, 222 (5th Cir. 2004) ("prisoners who have not been convicted of a sex offense have a liberty interest created by the [d]ue [p]rocess [c]lause in freedom from sex offender classification and conditions"), cert. denied, 546 U.S. 938, 126 S. Ct. 427, 163 L. Ed. 2d 325 (2005); *Neal* v. *Shimoda*, 131 F.3d 818, 830 (9th Cir. 1997) ("the stigmatizing consequences of the attachment of the 'sex offender' label coupled with the subjection of the targeted inmate to a mandatory treatment program

Anthony A. *v.* Commissioner of Correction

cess clause prohibits the government from depriving a person of any such interest except pursuant to constitutionally adequate procedures, the case was remanded to the habeas court for a determination of whether the department had afforded the petitioner the process he was due prior to assigning him the challenged classification. Id., 686. Presently before us is the petitioner's appeal[2] from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the habeas court incorrectly determined that the respondent, the Commissioner of Correction, did not violate his right to procedural due process in classifying him as a sex offender.[3] The peti-

---

whose successful completion is a precondition for parole eligibility create the kind of deprivations of liberty that require procedural protections'').

[2] The petitioner appealed to the Appellate Court from the judgment of the habeas court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Because the appeal in *Anthony A. II* came to this court on a motion to dismiss, we took the facts alleged in the petition to be true; *Anthony A.* v. *Commissioner of Correction*, supra, 326 Conn. 670; including that the petitioner was "classified . . . as a sex offender, despite the fact that he had not been convicted of a sex offense and had no prior history as a sex offender." Id., 672. In its memorandum of decision, the habeas court found that, although the amended habeas petition "allege[d] that the assignment of a [sex treatment need] score [of 3] classifies the petitioner as a sex offender," in fact, "[t]he respondent merely has classified the petitioner as having sexual treatment needs, not as being a sex offender." Prior to February, 2012, the department's administrative directive 9.2 provided that all inmates were to be assessed for their "[s]ex offender treatment" need. Conn. Dept. of Correction, Administrative Directive 9.2 (8) (B) (6) (effective July 1, 2006). On February 23, 2012, pursuant "to the advice of the various [a]ssistant [attorneys general] who have assisted the [department] in litigation and policy . . . regarding sex treatment need scores," the department removed the word "offender" from the directive such that inmates would no longer be assessed for their sex offender treatment need but, rather, for their sex treatment need. All of the criteria for determining an inmate's sex treatment need remained the same, however, as did the penalties for an inmate's refusal to sign an offender accountability plan classifying him in need of such treatment. Moreover, the department's Objective Classification Manual provides that a sex treatment need score of 3 is given to "individuals [who] have a current conviction, pending charge *or known history of sexual offenses involving physical contact with the victim(s)* (necrophilia included)" and that "[a]n inmate who engages in predatory sexual behavior while incarcerated will [also] be given a score of 3." (Emphasis added.)

Anthony A. *v.* Commissioner of Correction

tioner also claims that the habeas court incorrectly determined that the challenged classification did not violate his right to substantive due process or his right not to be "punished, except in cases clearly warranted by law," under article first, § 9, of the Connecticut constitution. We conclude that the petitioner was not afforded the procedural protections he was due prior to being classified as a sex offender and, therefore, that his classification violated his right to procedural due process under both the federal constitution and article first, § 9, of our state constitution.[4] We reject the petitioner's substantive due process claim. Accordingly, we reverse the judgment of the habeas court.

The following facts and procedural history are relevant to our resolution of this appeal. The petitioner was arrested and charged with several offenses, including sexual assault in a spousal relationship pursuant to General Statutes (Rev. to 2011) § 53a-70b, in connection with an incident that occurred on the evening of July 18 and the early morning hours of July 19, 2011, at the home of the petitioner's former wife, M. According to a police report, M informed the police that, on the night in question, she and the petitioner had been drinking and "smoking 'crack' " cocaine, which caused the petitioner to become paranoid and to act in a delusional manner. Believing that another person was in the house, the petitioner began searching for that person under the bed, in closets, and in the hallway outside the bedroom.

Conn. Dept. of Correction, Objective Classification Manual § III (D) (6), pp. 36, 37. Contrary to the habeas court's finding, therefore, although inmates are no longer assessed for their sex offender treatment need, the score assigned to the petitioner is reserved expressly for inmates with a "known history of sexual offenses"; id.; which is simply another way of saying inmates who are known sex offenders.

[4] As we explain more fully in part III of this opinion, we have long held that article first, § 9, of the Connecticut constitution is the criminal due process clause of our state constitution and that it affords no greater protections than the protections afforded under the federal constitution. See, e.g., *State* v. *Jenkins*, 298 Conn. 209, 259 n.39, 3 A.3d 806 (2010).

Anthony A. *v.* Commissioner of Correction

After repeatedly accusing M of having an affair, the petitioner "made her take off her clothing and [lie] on her back," whereupon he digitally penetrated her vagina and anus looking for " 'used condoms.' " Later, the petitioner became suspicious that another man had been using his video game system "and stuck [his] fingers inside [M's] vagina and anus again." When the petitioner continued to accuse her of having an affair, M, out of annoyance, lied to the petitioner that, in fact, she was having an affair with one of his friends, which caused the petitioner to become violent and to pour soda on M.

M informed the police that, following the soda incident, she went downstairs to shower and to get away from the petitioner. While she was showering, the petitioner entered the bathroom and threw cat litter, milk, flour and paint on her. He also slammed the shower door repeatedly in an apparent effort to "smash it." The petitioner then forced M back into the bedroom and onto the bed. When M attempted to get out of the bed, the petitioner restrained her and punched her in the face. M was able to summon the police when the petitioner left to use the bathroom. According to the responding officers, the house was in "shambles" when they arrived on the scene, with damage, "including but not limited to . . . broken doors, smashed glass windows, and red liquid splattered on [the] floor later identified as paint." The officers also observed bruising on M's arms and above her right eye. While being transported to a hospital, M informed the paramedics that the petitioner had sexually assaulted her, a claim she repeated to police officers when they interviewed her a short time later.

In the petitioner's statement to the police, he admitted to " 'getting high' " on cocaine and to questioning M about whether she was having an affair. The petitioner also stated that, throughout the night, as he lay in bed next to M, he touched the inside and outside of

her vagina despite her saying " 'no' " and that she was not in the mood, pushing his fingers away, and clenching her legs. The petitioner stated that, when M said "no," he would stop for a while before trying again, which happened "several times" throughout the night, and that, at one point, M "got [so] tired of him putting his fingers in her vagina [that] she . . . threw her phone at him." The petitioner stated that "he then took [the] phone and snapped it in half."

M subsequently recanted her statement to the police. In a notarized letter dated August 17, 2011, she stated that she "[did] not wish to pursue any . . . charges against [the petitioner]," that "the police report [concerning the night in question was] inaccurate" and that the petitioner "never sexually assaulted [her]." M explained that she and the petitioner "are very sexually active and [that] any marks [on her body that evening] came from [their] sexual activity . . . ." M further stated that her "face was injured when [she] came out of the shower and slipped on the wet floor," and that the petitioner "was not present" when she fell and "at no time tried to harm [her]." She concluded by asserting that "from the day [she] met [the petitioner] he [has] NEVER EVER [been] violent" and "has never laid a hand on [her] in any way." (Emphasis in original.)

On February 21, 2012, the prosecutor informed the trial court that she had met with M, who informed her that "she was abusing substances" on the night in question, that she no longer recalled her conversation with the police, and that she "now believes that something different happened [from the sexual assault that] was alleged to have happened . . . ." The prosecutor informed the court that M also stated that, "when she sobered up, she saw [that] what really happened . . . was not [that the petitioner had] sexually assault[ed] her," that, "when she . . . slipped and hit her head [in the bathroom] . . . she had a seizure and sometimes

. . . seizures make her believe things that are not actually true," and that she "has no memory of whatever she told the police, but [now] believes it to be . . . incorrect." Accordingly, the state entered a nolle prosequi on the charge of sexual assault in a spousal relationship. *Anthony A.* v. *Commissioner of Correction*, supra, 326 Conn. 671. The petitioner thereafter pleaded guilty to unlawful restraint in the first degree, failure to appear, and violation of probation, for which he was sentenced to an effective term of three years and six months of incarceration. *Anthony A.* v. *Commissioner of Correction*, 159 Conn. App. 226, 229, 122 A.3d 730 (2015) (*Anthony A. I*), cert. denied, 326 Conn. 668, 166 A.3d 614 (2017).

Upon his incarceration, the petitioner was classified pursuant to the department's administrative directive 9.2, which requires that "[e]ach inmate under the custody of the [respondent] . . . be classified to the most appropriate assignment for security and treatment needs to promote effective population management and preparation for release from confinement and supervision." Conn. Dept. of Correction, Administrative Directive 9.2 (1) (effective July 1, 2006) (Administrative Directive 9.2). An inmate's classification is based on the individual risk and needs of the inmate, which are determined by an assessment of seven risk factors and seven needs factors. Administrative Directive 9.2 (8) (A) and (B). For each factor, an inmate is assigned a score of 1 to 5, with 1 representing the lowest score and 5 representing the highest score. Administrative Directive 9.2 (6). Among the seven needs factors, inmates are assessed for their sex treatment need (STN). Administrative Directive 9.2 (8) (B) (6). An inmate's risk and needs level is used to determine "appropriate confinement location, treatment, programs, and employment assignment whether in a facility or the community." Administrative Directive 9.2 (3)

Anthony A. *v.* Commissioner of Correction

(A). Inmates are further provided an "overall classifica-tion assessment score" of 1 to 5 that corresponds to the highest rating assigned to any of the seven risk factors. Administrative Directive 9.2 (6) and (8) (C). "No inmate with [an STN] score of 2 or greater [may] be assigned an overall score below level 3 without authorization from the [respondent] or designee." Administrative Directive 9.2 (8) (C).

The department's Objective Classification Manual (manual) details the process for assigning an STN score. The manual provides that an inmate's STN score indi-cates whether they have "a record or known history of problem sexual behavior." Conn. Dept. of Correction, Objective Classification Manual § III (D) (6), p. 35 (2012) (Classification Manual). The manual further pro-vides that, in assigning an STN score, the department may rely on "information acquired through [c]ourt [t]ranscripts, [presentence] [i]nvestigations (PSI), police reports, [department] [r]eports, Department of Children [and] Families . . . reports, etc." Id. "Infor-mation from charges which were nolled, acquitted, dis-missed, withdrawn or dropped, which is part of a crime resulting in a conviction, [also] may be used to deter-mine needs scores based [on] the description of the crime from [the relevant] police reports, [PSIs], or other reliable investigative reports." (Emphasis omitted.) Id., § III (A), p. 5. The manual further provides that a hearing is required before an STN score can be assigned based on "non-conviction information . . . ." Id., § III (D) (6), p. 36. An inmate who receives an STN score of 2 or higher "shall be referred to [the] sex treatment program staff for evaluation." Id. "Upon receipt of a referral, the sex offender program staff . . . conduct[s] an assess-ment to determine the inmate's eligibility to participate in sex offender programs. Inmates [are] prioritized for services based on clinical needs, motivation, available resources and release date." Conn. Dept. of Correction,

Anthony A. *v.* Commissioner of Correction

Administrative Directive 8.13 (7) (effective October 31, 2007).

On August 7, 2012, the petitioner learned that the department had assigned him an STN score of 3, which, under the manual, is given to inmates who "have a current conviction, pending charge or known history of sexual offenses involving physical contact with the victim(s) . . . ." Classification Manual, supra, § III (D) (6), p. 36. The petitioner's score was based on his and M's initial statements to the police recounting the events culminating in the petitioner's arrest on July 19, 2011. Because of his score, the petitioner's offender accountability plan (OAP) recommended that he participate in "sex treatment," stating that a failure to do so would "negatively impact" the petitioner's ability to earn risk reduction credit[5] and to participate in "supervised community release and/or parole." "The petitioner refused to sign the [OAP] and requested a hearing to prove that he had not sexually assaulted [M]. He claimed that the sex offender designation and treatment recommendation should be removed from his [OAP]. The department responded: 'You had a hearing on [July 7, 2012], and it was found to be verified in the police report that there was [nonconsensual] sexual contact. Therefore, your [STN] score . . . is accurate and will not be changed.' The petitioner's repeated efforts to modify his [OAP] to delete the sex offender designation were all unsuccessful." (Footnotes omitted.) *Anthony A.* v. *Commissioner of Correction*, supra, 159 Conn. App. 230.

On February 20, 2013, the then self-represented petitioner filed a petition for a writ of habeas corpus in which he claimed that he was incorrectly classified as a sex offender without due process of law. *Anthony A.* v. *Commissioner of Correction*, supra, 326 Conn. 672.

_____

[5] Risk reduction credit is credit an eligible inmate may earn "toward a reduction of [his or her] sentence . . . ." General Statutes § 18-98e (a).

Anthony A. *v.* Commissioner of Correction

The habeas court concluded that the petitioner did not have a protected liberty interest in not being wrongly classified as a sex offender and dismissed the petition. Id., 673. The Appellate Court reversed the judgment and remanded the case to the habeas court, concluding that the petitioner did have such a protected liberty interest. Id., 674. This court thereafter affirmed the Appellate Court's judgment. Id., 686. In so doing, we explained that the Appellate Court, in reaching its decision, "first considered whether the petition had been rendered moot by the petitioner's release from prison prior to oral argument. . . . The [Appellate Court] observed that the petitioner had informed the court that, after his release, he had been arrested in connection with new charges and was being detained at New Haven Correctional Center. . . . Because of the petitioner's new arrest, the Appellate Court reasoned that there was a reasonable possibility that, should he return to prison, he will again be classified as being in need of sex offender treatment because the department [had] assigned him [an STN] score with a recommended sex offender treatment referral during his previous incarceration. . . . The [Appellate Court] concluded, therefore, [and we agreed] that the collateral consequences exception to the mootness doctrine applied." (Citations omitted; internal quotation marks omitted.) Id., 673–74; see id., 674 n.6.

On or about June 16 and 26, 2017, the petitioner pleaded guilty to the new charges and was sentenced to concurrent terms of incarceration. Following his return to the respondent's custody, on November 29, 2017, the petitioner was notified that a hearing would be held on December 27, 2017, to determine whether he would be assigned an STN score of greater than 1 based on his July 19, 2011 arrest for sexual assault in a spousal relationship. The petitioner was advised that, in making its determination, the department would rely

on the police report of that arrest as well as the petitioner's "CT State Rap Sheets." In advance of the hearing, the petitioner submitted an inmate request form requesting that, at his hearing, he be permitted to argue on his own behalf, to present documentary evidence, to present live witness testimony, and to be represented by counsel. The petitioner received a response from Elizabeth Tugie, the counselor supervisor of offender classification and population management at the department, granting his requests to argue on his own behalf and to present documentary evidence but denying his requests to present live witness testimony, stating that it was "[in]consistent with institutional safety concerns," and to be represented by counsel, stating that the hearing was "not intended to be adversarial but . . . to ensure that you are properly classified."

At his classification hearing, the petitioner denied sexually assaulting M, stating that M could not recall events from the night in question because she had been drinking and she suffers from seizures. The petitioner further stated that he and M had engaged in " 'normal sexual relations,' " that he "never touched [her] sexually without her consent and [that he] stopped touching her when she pulled away." In support of these assertions, the petitioner submitted several documents, including M's August 17, 2011 letter recanting her July 19, 2011 statement to the Meriden police and the transcript of his February 21, 2012 plea hearing, at which the prosecutor informed the trial court about M's recantation. The petitioner also submitted a letter from his former defense counsel that described an August 23, 2011 meeting counsel had with M, during which M "was adamant that [the petitioner] did not sexually assault her" and that "she did not want to press charges" against him. The letter further stated that M also informed counsel that she "wanted the protective order that was entered against [the petitioner] dropped."

Anthony A. *v.* Commissioner of Correction

Following the hearing, Tugie, who served as the hearing officer, notified the petitioner that he met ''the requirements for assignment of an [STN] score as outlined in the [manual]'' and, accordingly, that she had assigned him an STN score of ''3VN.''[6] The notice stated that, in arriving at her decision, Tugie had reviewed, in addition to the petitioner's July 19, 2011 arrest record, the petitioner's complete Connecticut criminal record, including ''numerous corresponding police reports and arrest warrant applications . . . .'' The notice further stated that Tugie's supervisor, David Maiga, had reviewed and approved the petitioner's assigned STN score and that, pursuant to the department's administrative directive 9.6, the petitioner could appeal the score, which he did. On March 5, 2018, Tugie and Maiga considered and denied the appeal after discussing it for approximately ''thirty seconds.'' As a result of his STN score of 3, the petitioner could not be placed in a facility lower than level three without authorization from the respondent or the respondent's designee; see Administrative Directive 9.2 (8) (C); which rendered the petitioner, a veteran of the Iraq war, ineligible for a veterans program available only at a level two facility. Also, in light of his STN classification, the petitioner was once again referred to the sex treatment program staff for evaluation but refused to participate in that evaluation on the ground that the department incorrectly had labeled him a sex offender.[7] On March 20, 2018, the

---

[6] The manual defines the subcode ''V'' as: ''Verified: Information used to classify the individual is documented in the official record and is considered accurate.'' Classification Manual, supra, § III (D) (6), p. 38. The manual further defines the subcode ''N'' as ''[d]enot[ing] [that the] score [is] based on [nonconviction] information.'' Id.

[7] The habeas court found that the petitioner was referred to have his sexual treatment needs determined and that he ''was determined [not to] require sexual offender treatment, and none was ordered or required by [the department].'' That finding is contrary to the evidence presented to the habeas court. The petitioner testified that, as a result of his classification, he was asked to participate in an evaluation to determine whether he would receive sex treatment but that he refused to do so because he was ''not a

Anthony A. *v.* Commissioner of Correction

petitioner was found guilty of refusing to sign his OAP. As punishment, the petitioner forfeited twenty-five days of earned risk reduction credit and was prospectively barred from earning additional risk reduction credit until he signed the OAP. The petitioner's refusal to sign the OAP also negatively impacted his eligibility for parole and community release.

On April 18, 2018, the petitioner, now represented by counsel, filed a third amended petition for a writ of habeas corpus in which he alleged that, in assigning his 2017 STN score, the department violated his constitutional right to procedural due process in the following ways: (1) by providing him inadequate notice of the evidence to be relied on in deciding his score; (2) by precluding him from presenting live witness testimony at the classification hearing; (3) by not having the hearing administered by an impartial decision maker; and (4) by basing the classification decision on insufficient evidence and failing to assess the credibility of M's allegations of sexual assault.[8] The petitioner further

sex offender.'' Tugie also testified that, although not certain, she did not believe that the petitioner met with the sex treatment program staff for an evaluation because the petitioner had refused to sign his OAP. Similarly, Maiga testified that, following his classification, a sex treatment referral was added to the petitioner's OAP. The petitioner refused to sign that OAP. According to Maiga, had the petitioner signed his OAP, he would have met with the sex treatment program staff to determine if he needed treatment. Accordingly, contrary to the finding of the habeas court, the petitioner was not evaluated by the sex treatment program staff for his sexual treatment needs, and, therefore, it was never determined that he did not require sex treatment.

[8] The petitioner also alleged that the department violated his right to procedural due process by not allowing him to be represented by counsel at his hearing, not providing him the opportunity to cross-examine his accusers, not providing him a sufficient explanation of the reasons for its classification decision, ignoring medical evidence he submitted, not providing a reasonable explanation for ignoring that evidence, and not adequately assessing the credibility or reliability of hearsay statements relied on to reach its classification decision. The petitioner failed to address these claims in his posttrial brief, and, accordingly, the habeas court deemed them abandoned. The petitioner does not raise any of those claims on appeal, and we do not discuss them.

Anthony A. *v.* Commissioner of Correction

alleged that, by classifying him as a sex offender, even though he had never committed or been convicted of a sex offense, the department violated his constitutional right to substantive due process as well as his right not to be "punished, except in cases clearly warranted by law" under article first, § 9, of the Connecticut constitution.[9]

A trial was held on the petition on July 10 and 30, 2018, at which Tugie testified that the petitioner's STN score was assigned based on nonconviction information, which she described as information relating to a crime of which an inmate has been convicted indicating that the inmate, in the course of committing that crime, engaged in conduct that constitutes "some semblance" of a sex offense, even though the inmate was not convicted of a sex offense. Tugie testified that, in assigning the petitioner his score, she had credited M's original statement to the police concerning the events of July 19, 2011, over M's subsequent recantation of that statement. Tugie further testified that, although the score was based on the petitioner's July 19, 2011 arrest for sexual assault in a spousal relationship, after the hearing, she requested and reviewed reports of other incidents of domestic disputes between the petitioner and M in order to assess the reliability of M's recantation. Tugie acknowledged that the petitioner was never notified that she would review these other records in making her decision. Tugie explained that, in her experience, it is "common for victims of domestic violence to recant their statements out of fear . . . [or] sometimes coercion" and that these other reports confirmed for her that M's recantation was not reliable.[10] Tugie noted,

_____

[9] The petitioner further alleged a violation of his constitutional right to be free from cruel and unusual punishment but abandoned that claim in his posttrial brief.

[10] Tugie testified that she had training as a "domestic violence facilitator" but did not provide any specific details as to what that role is or what the training for it entailed. It is unclear from the record whether the training Tugie received qualified her to assess the reliability of M's recantation in light of domestic disputes between the petitioner and M.

moreover, that she took into account the petitioner's own statements to the police following his July 19, 2011 arrest in determining the petitioner's score.

Tugie's supervisor, Maiga, also testified at the habeas trial. Maiga stated, among other things, that the department no longer classifies inmates as "sex offenders" but, rather, as inmates "having a sexual treatment need."[11] Maiga further testified that he first became aware of the petitioner's case following the Appellate Court's decision in *Anthony A. I* and that he and Tugie had discussed the impact of that decision on the department's classification policies before assigning the petitioner an STN score in 2017. Maiga explained that, under administrative directive 9.2 (8) (C), the petitioner was required to reside at a level three or higher facility based on his STN score and that such facilities are some of the more secure and restrictive housing options within the department.

Finally, the petitioner called Amanda Kingston, a forensic psychiatrist, to testify about an independent review of the petitioner's medical record she conducted to determine if he had a need for sex offender treatment. Kingston's conclusions are summarized in a report dated February 9, 2018, which was entered into evidence. In her report, Kingston noted that, although the petitioner previously has received several psychiatric diagnoses, his "psychiatric records do not indicate any history of problem sexual behaviors . . . ." The report concludes that the July 19, 2011 incident between the petitioner and M "appears to have occurred in the setting of psychosis due to [the petitioner's] underlying schizoaffective disorder [as] exacerbated by his cocaine use at the time" and does not "indicate an underlying sexual disorder or paraphilia." Kingston opined that "sexual offender treatment would not address the underlying risk factors that led to [the petitioner's] sex-

[11] See footnote 3 of this opinion.

Anthony A. *v.* Commissioner of Correction

ual behaviors in 2011'' and that treatment focused on his underlying risk factors would be more appropriate.[12] Kingston testified that, due to time constraints, she was unable to interview the petitioner before drafting her report but that she did interview him twice after completing it and that those interviews had not changed her opinion.

On February 25, 2019, the habeas court issued a memorandum of decision in which it denied the petitioner's habeas petition. With respect to the petitioner's procedural due process claim, the court applied the standard set forth in *Wolff* v. *McDonnell*, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), in which the United States Supreme Court held that ''due process requires procedural protections before a prison inmate can be deprived of a protected liberty interest''; *Superintendent* v. *Hill*, 472 U.S. 445, 453, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985); which include ''(1) advance written notice of the [action to be taken]; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and [to] present documentary evidence . . . and (3) a written statement by the [fact finder] of the evidence relied on and the reasons for the . . . action.'' Id., 454. The habeas court then considered and rejected each of the petitioner's contentions regarding the inadequacy of the process he was provided prior to being classified as a sex offender. With respect to the petitioner's claim that Tugie improperly refused to allow him to present live testimony at the

_____

[12] On July 17, 2018, the petitioner became parole eligible. In advance of his parole eligibility, the petitioner refused a sex offender evaluation by the Board of Pardons and Paroles (board). As a result, David Rentler, the supervising psychologist for the board, was asked to review the petitioner's case to determine whether that evaluation would be required before the petitioner may receive a parole hearing. Rentler concluded that the evaluation was not required because the petitioner's conduct did ''not appear to have an underlying sexual motivation'' but, rather, resulted from ''paranoia and suspicious beliefs likely induced by [drug use].''

hearing, the court observed that "it is not [the department's] policy to permit live witness testimony because of safety and security concerns" and that "the petitioner does not have a due process right to present the testimony of live witnesses, in particular not civilians such as [M], who is the protected person in a criminal protective order issued by a court.[13] The [department] had a reasonable basis to exclude such witnesses and properly used discretion when denying the petitioner's request to present live witnesses at the classification hearing." (Footnote added.)

The habeas court also rejected the petitioner's contention that there was insufficient evidence to support his STN score. The court explained that, in the prison context, due process is satisfied so long as there is " 'some evidence' " in the record supporting the challenged decision and that, in the present case, that standard was more than met in light of M's detailed statement to the police recounting the petitioner's sexual misconduct and "the petitioner's own statement regarding [his] several attempts at initiating sex by digitally penetrating [M's] vagina, despite her saying no, repeatedly." (Internal quotation marks omitted.) In reaching its decision, the habeas court rejected the petitioner's contention that, under *Luna* v. *Pico*, 356 F.3d 481, 489 (2d Cir. 2004), and *Sira* v. *Morton*, 380 F.3d 57, 78 (2d Cir. 2004), Tugie was required to conduct an independent investigation into M's "background and reputation for truthfulness" before she could rely on M's recanted statement, stating that the cited cases established no such requirement.

The habeas court next addressed the petitioner's contention that the department improperly failed to notify

_____

[13] It is undisputed that the petitioner did not seek to call M as a witness, only his former defense counsel, the police officers who took M's statement, and Kingston.

him that it would consider his entire criminal record, not just the record of his July 19, 2011 arrest, in determining his STN score. The court concluded that the notification received by the petitioner, which stated that the department would consider his ''CT State Rap Sheets,'' provided sufficient notice that ''any law enforcement documents relating to his arrests and convictions could be reviewed.'' The court also credited Tugie's testimony that the petitioner's STN score was not based on any records other than his July 19, 2011 arrest record. To the extent Tugie reviewed any of the petitioner's other criminal records, the court concluded that it was strictly for purposes of deciding whether M's recantation was reliable. Finally, the court summarily rejected the petitioner's contention that Tugie and Maiga were not impartial decision makers, stating that there was simply no evidence to support that claim.

With respect to the petitioner's claim that the sex offender classification violated his right to substantive due process, the habeas court explained that, because the petitioner is not a member of a protected class, the department needed only a rational basis for classifying him as a sex offender, and that the department's ''interest in managing the inmate population, assessing inmates for treatment while incarcerated, and facilitating their eventual transition back into society in a manner that safeguards society from repeat offenses'' provided such a basis. In reaching its determination, the court rejected the petitioner's contention that ''his classification is inherently suspect because he has mental disabilities [and because] the classification procedures target individuals with mental disabilities,'' stating that the petitioner had failed to present ''any evidence that sexual disorders are mental disabilities'' or that the ''[department's classification system] targets such individuals.'' The court also rejected the petitioner's claim that his STN score constituted punishment

not clearly warranted by law in violation of article first, § 9, of the Connecticut constitution, concluding that the petitioner was not being punished as a result of his STN score but, rather, for refusing to sign his OAP.

On appeal to this court, the petitioner renews his claims before the habeas court that his classification as a sex offender violated his procedural and substantive due process rights, as well as his right not to be "punished, except in cases clearly warranted by law," under article first, § 9, of the Connecticut constitution.

I

We begin with the petitioner's claim that the habeas court incorrectly concluded that he received all the process he was due prior to being classified as a sex offender. The petitioner contends that the department's "blanket policy" against live witness testimony violated *Wolff*'s mandate that inmates must be allowed to present live testimony unless doing so would "be unduly hazardous to institutional safety or correctional goals." *Wolff* v. *McDonnell*, supra, 418 U.S. 566. The petitioner further contends that the habeas court incorrectly determined that the department provided prior written notice of the evidence it would rely on in assigning him his STN score because the notification he received stated that, in addition to his July 19, 2011 arrest record, the department would review his "CT State Rap Sheets." The petitioner further contends that the habeas court incorrectly determined that Tugie and Maiga were impartial decision makers despite the fact that (1) they were aware of and had discussed his case following the Appellate Court's decision in *Anthony A. I*, and (2) they, rather than a disinterested decision maker, ruled on his appeal from the decision that they themselves had made. Finally, the petitioner contends that the habeas court incorrectly determined that Tugie was not required to undertake an independent credibility

assessment of M before crediting her July 19, 2011 statement to the police, a mistake the petitioner claims was compounded by the habeas court's clearly erroneous factual finding regarding M's reason for recanting that statement, namely, her inability to recall the events in question.

The respondent argues in response that the habeas court correctly determined that the petitioner received all of the protections he was due under *Wolff*, including adequate notice of the evidence the department would rely on in deciding his classification. The respondent contends that *Wolff* did not establish an absolute right to present live witness testimony, that Tugie testified that department "policy does not permit live witness testimony because of safety and security concerns," and that, under *Wolff*, it was proper for the habeas court to defer to that policy. The respondent further argues that the habeas court properly rejected the petitioner's claim that Tugie and Maiga were not impartial decision makers in light of the petitioner's failure to present any evidence to support that claim. Finally, the respondent argues that the habeas court correctly determined that there was sufficient evidence to support the petitioner's STN score in light of M's detailed statement to the police describing the petitioner's sexual misconduct and the petitioner's own statement, which largely corroborated M's statement.

We conclude that, although the petitioner was afforded some of the procedural protections required by *Wolff*, it is clear that he was not provided all of them. In particular, he was not provided (1) an opportunity to call witnesses in his defense, (2) adequate notice of the information to be relied on in determining his classification, (3) and an impartial decision maker to rule on his appeal.

Whether the department violated the petitioner's procedural due process rights presents a question of law

over which our review is plenary. See, e.g., *State* v. *Harris*, 277 Conn. 378, 393, 890 A.2d 559 (2006). It is well established that "[t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Faraday* v. *Commissioner of Correction*, 288 Conn. 326, 338, 952 A.2d 764 (2008).

In *Wolff*, the United States Supreme Court held that, when a disciplinary hearing may result in the loss of good time credits, due process requires that an inmate receive (1) advance written notice of the disciplinary charges, (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and to present documentary evidence in his defense, (3) an impartial decision maker, and (4) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action. *Wolff* v. *McDonnell*, supra, 418 U.S. 563–66, 571. In *Superintendent* v. *Hill*, supra, 472 U.S. 445, the Supreme Court expanded these protections to include a requirement that the fact finder's decision be supported by "some evidence" in the record. Id., 454. We previously have explained that "[the some evidence] standard is a lenient one, requiring only a modicum of evidence to support the challenged decision. [Id., 455]. Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. Id., 455–56; see also *Castro* v. *Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013) (characterizing test as minimally stringent)." (Internal quota-

Anthony A. *v.* Commissioner of Correction

tion marks omitted.) *Vandever* v. *Commissioner of Correction*, 315 Conn. 231, 245, 106 A.3d 266 (2014).

Although *Wolff* does not expressly require prior notice of the evidence to be relied on at the hearing; see *Wolff* v. *McDonnell*, supra, 418 U.S. 563; courts have recognized that such a requirement is implicit in the statement in *Wolff* that the notice must "inform [an inmate] of the charges [against him] . . . to enable him to marshal the facts and prepare a defense." Id., 564; see also, e.g., *Vitek* v. *Jones*, 445 U.S. 480, 494–96, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) (before prisoner may be transferred to mental hospital, *Wolff* requires prior "disclosure to the prisoner . . . of the evidence being relied upon" to support transfer); *Meza* v. *Livingston*, 607 F.3d 392, 409 (5th Cir. 2010) (concluding that, under *Wolff*, before parolee was labeled sex offender and required to participate in sex offender therapy, he was entitled to "disclosure of the evidence being presented against [him] to enable him to marshal the facts asserted against him and prepare a defense").

Federal courts uniformly have held that the due process requirements in *Wolff* apply to proceedings to determine whether an inmate who has not previously been convicted of a sex offense may be classified as a sex offender for purposes of rehabilitation, treatment, or parole. See, e.g., *Renchenski* v. *Williams*, 622 F.3d 315, 331 (3d Cir. 2010) (before inmate may be labeled sex offender and required to participate in sex therapy, he is entitled to " 'an effective but informal hearing,' " which includes protections outlined in *Wolff*), cert. denied, 563 U.S. 956, 131 S. Ct. 2100, 179 L. Ed. 2d 926 (2001); *Meza* v. *Livingston*, supra, 607 F.3d 410 ("[b]ecause [a parolee's] interest in being free from sex offender conditions is greater than an inmate's interest in [good time] credits, [the parolee] is owed, at a minimum, the same process due to inmates under *Wolff*"); *Gwinn* v. *Awmiller*, 354 F.3d 1211, 1218–19 (10th Cir.)

Anthony A. *v.* Commissioner of Correction

(because classification as sex offender reduces rate at which inmate can earn good time credits, inmate is entitled to procedural protections in *Wolff*), cert. denied, 543 U.S. 860, 125 S. Ct. 181, 160 L. Ed. 2d 100 (2004); *Neal* v. *Shimoda*, 131 F.3d 818, 831 (9th Cir. 1997) (because classification of inmate as sex offender and mandatory successful completion of sex offender treatment program as precondition for parole eligibility implicate protected liberty interest, inmate is entitled to procedural protections in *Wolff*).

Although the court in *Wolff* cautioned that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority"; *Wolff* v. *McDonnell*, supra, 418 U.S. 566; it held that "inmate[s] facing disciplinary proceedings should be allowed to call witnesses"; id., 566; and recommended that prison officials who deny them that right "state [their] reason[s] for [doing so], whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." Id. Thus, courts have interpreted *Wolff* as establishing a right to call witnesses, albeit one that can be denied for good reason. See, e.g., *Ponte* v. *Real*, 471 U.S. 491, 495, 105 S. Ct. 2192, 85 L. Ed. 2d 553 (1985) ("[c]hief among the due process minima outlined in *Wolff* was the right of an inmate to call and present witnesses . . . in his defense before the disciplinary board"); id., 499 (declining to place burden on inmate to show why action of prison officials refusing to call witnesses was arbitrary or capricious); *Renchenski* v. *Williams*, supra, 622 F.3d 331 (recognizing inmate's right to "present witness testimony . . . except upon a finding, not arbitrarily made, of good cause for not permitting such presentation" (internal quotation marks omitted)); *Meza* v. *Livingston*, supra, 607 F.3d 409 (inmate was entitled to "a hearing at which [he] is permitted to . . . call wit-

Anthony A. *v.* Commissioner of Correction

nesses''); *Gwinn* v. *Awmiller*, supra, 354 F.3d 1219 (inmate was entitled to ''opportunity to present witnesses and evidence'' in defense of charges); *Neal* v. *Shimoda*, supra, 131 F.3d 831 (stating that hearings to classify inmates as sex offenders do not implicate same safety concerns present in *Wolff* such that ''an inmate whom the prison intends to classify as a sex offender is entitled to a hearing at which he must be allowed to call witnesses and present documentary evidence in his defense'').

In the present case, it is undisputed that the department denied the petitioner's request to call witnesses without knowing who the witnesses were or what they would say, or considering whether their presence would be ''unduly hazardous to institutional safety or correctional goals . . . .'' *Wolff* v. *McDonnell*, supra, 418 U.S. 566. As previously indicated, the petitioner had planned to call his former defense counsel, the police officers who took M's statement, and Kingston, the forensic psychiatrist who interviewed him. According to Tugie, it did not matter whom he planned to call because the department's policy is not to allow live witness testimony under any circumstance.[14] Tugie also testified, however, that the department routinely allows police officers, lawyers, and medical staff into its facilities to meet with inmates, a practice that belies the safety and security concerns invoked to deny the peti-

[14] Contrary to the habeas court's determination, the witnesses the petitioner sought to present at his hearing, in particular the police officers who took M's statement and the petitioner's former defense counsel, to whom M retracted her sexual assault allegation, were relevant to the department's classification decision because each of those witnesses could have provided testimony that described the context and, thus, the reliability of both M's allegation and subsequent recantation. As previously indicated, Tugie testified that she conducted additional research into the petitioner's arrest record following the classification hearing to assist her in deciding the credibility of M's recantation and, therefore, the credibility of the petitioner's assertions that M's initial statement to the police was the product of her drug and alcohol use on the night in question.

Anthony A. *v.* Commissioner of Correction

tioner's request to call police officers, a lawyer, and a medical professional as witnesses at his hearing. Under *Wolff*, in the absence of a showing by the department that their presence at the prison would have been unduly hazardous to institutional safety concerns, the petitioner should have been permitted to call these witnesses. See, e.g., *Redding* v. *Fairman*, 717 F.2d 1105, 1114 (7th Cir. 1983) (although "prison officials have the discretion to refuse inmates' requests for witnesses to protect institutional safety or to keep the length of the hearing within reasonable limits . . . in this case no witnesses were allowed to testify at either hearing, and there is no indication that the requests were unreasonable"), cert. denied, 465 U.S. 1025, 104 S. Ct. 1282, 79 L. Ed. 2d 685 (1984).[15]

We also agree with the petitioner that the department did not provide him with adequate notice of the evidence it would use in determining his classification. As previously indicated, Tugie testified that, after the classification hearing had concluded, she conducted additional research into the petitioner's criminal record, which included reviewing all of the petitioner's arrest records, in order to assess the reliability of M's recantation. She further testified that she never notified the petitioner that the facts of his past arrests would be used against him. Under *Wolff*, the petitioner was entitled to this information so as to allow him "a chance to marshal the facts in his defense . . . ." *Wolff* v. *McDonnell*, supra, 418 U.S. 564; see also *Vitek* v. *Jones*, supra, 445 U.S. 494–96.

We disagree with the habeas court that the department satisfied the notice requirements of *Wolff* by noti-

---

[15] To reiterate, it is undisputed that the petitioner did not seek to call M, a person protected under a criminal protective order, as a witness. See footnote 13 of this opinion. Had the petitioner sought to do so, we would be presented with entirely different circumstances than those of the present case.

Anthony A. *v.* Commissioner of Correction

fying the petitioner that his "CT State Rap Sheets" would be reviewed as part of the decision-making process. It is well established that a "rap sheet" is a criminal history report produced by the state police containing no specific details about the underlying facts of any of the listed charges or convictions. See *United States Dept. of Justice* v. *Reporters Committee for Freedom of the Press*, 489 U.S. 749, 752, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989) ("[r]ap sheets . . . contain certain descriptive information, such as date of birth and physical characteristics, as well as a history of arrests, charges, convictions, and incarcerations of the subject"). Police reports, on the other hand, are quite detailed and may contain incomplete or factually inaccurate information.

The petitioner next argues that the decision to classify him as a sex offender was not rendered by impartial decision makers because Tugie and Maiga discussed his case following the release of the decision in *Anthony A. I.* We disagree. Although "*Wolff* holds that prisoners are entitled to impartial [decision makers]"; *White* v. *Indiana Parole Board*, 266 F.3d 759, 767 (7th Cir. 2001); courts have interpreted this requirement as "prohibit[ing] only those officials who have [had] a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge from sitting on the disciplinary body." (Internal quotation marks omitted.) *Redding* v. *Fairman*, supra, 717 F.2d 1113. The record contains no evidence of any personal involvement by Tugie or Maiga in the factual circumstances on which they based their initial decision to classify the petitioner as a sex offender; nor has the petitioner identified any other evidence that could possibly call into question their ability to impartially carry out their classification duties. See, e.g., *Gwinn* v. *Awmiller*, supra, 354 F.3d 1221 (no due process viola-

tion even though hearing officer was named in inmate's action challenging prison classification system because evidence "[did] not indicate that [the officer] was incapable of fairly weighing the evidence presented . . . and determining whether [the inmate] had actually committed the alleged [misconduct]"); id., 1220–21 (noting that "courts should be alert not to sustain routine or pro forma claims of disqualification" because, "[f]rom a practical standpoint, [unwarranted disqualifications] . . . would heavily tax the working capacity of the prison staff" (internal quotation marks omitted)).

We agree with the petitioner, however, that Tugie and Maiga were not impartial decision makers when they ruled on the petitioner's appeal from their own initial classification decision. Although we are mindful not to overburden prison officials with needless disqualifications, the due process principle of fairness required that a different decision maker decide the merits of that appeal. See, e.g., *Withrow* v. *Larkin*, 421 U.S. 35, 58 n.25, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) ("[W]hen review of an initial decision is mandated, the [decision maker] must be other than the one who made the decision under review. . . . Allowing a [decision maker] to review and evaluate his own prior decisions raises problems . . . ." (Citations omitted.)); cf. *Reilly* v. *District Court*, 783 N.W.2d 490, 498 (Iowa 2010) (impartial decision maker was provided when inmate had "the opportunity to appeal the [disciplinary] decision to the deputy warden, who was not at the original hearing").

Finally, although, for the reasons previously stated, we conclude that the petitioner was denied due process of law because of the manner in which the department conducted his classification hearing, we agree with the habeas court that there was sufficient evidence in the record to support the department's classification decision. As we have explained, "the requirements of due process are satisfied if . . . there is any evidence in

Anthony A. *v.* Commissioner of Correction

the record that could support the conclusion reached
. . . .'' (Citation omitted.) *Superintendent* v. *Hill*,
supra, 472 U.S. 455–56. In the present case, the evidence
consisted of M's detailed statement to two police offi-
cers (and the paramedics who attended her) that the
petitioner had sexually assaulted her, and the petition-
er's own statements to the police that corroborated
some of M's account. As previously indicated, the peti-
tioner informed the police that he continued to touch
M's vagina despite her pushing him away, telling him
'' 'no,' '' clenching her legs, and even throwing a phone
at him. When combined with M's account, there was
more than enough evidence to support the department's
decision that the petitioner had likely committed a sex
offense. See, e.g., *Vandever* v. *Commissioner of Correc-
tion*, supra, 315 Conn. 245 (''[the some evidence] stan-
dard is a lenient one'').

In arguing to the contrary, the petitioner cites *Luna*
v. *Pico*, supra, 356 F.3d 481 and *Sira* v. *Morton*, supra,
380 F.3d 57, which he claims required Tugie to conduct
an independent credibility assessment of M before cred-
iting her statement. Both cases are readily distinguish-
able. In *Luna*, the court held that the evidence used to
find an inmate, Alejandro Luna, guilty at two separate
disciplinary hearings of assaulting a fellow inmate, Hec-
tor Lopez, failed to satisfy the '' 'some evidence' '' stan-
dard. *Luna* v. *Pico*, supra, 485, 489. The court stated
that, at most, the evidence consisted of a bald accusa-
tion from Lopez, who later refused to testify at Luna's
hearing. Id., 489. The court held that, under these cir-
cumstances, ''[d]ue process require[d] that there be
some 'independent credibility assessment' '' of Lopez
before crediting his bare accusation. Id., 489–90. In *Sira*,
an inmate, Rubin Sira, following a disciplinary hearing,
was found guilty of organizing inmates to participate
in a prison demonstration. *Sira* v. *Morton*, supra, 65.
The evidence relied on to find him guilty was supplied

by two prison officials who shared information they had learned from five confidential informants, none of whom testified at the hearing. Id., 63–65. Because the information provided to the prison officials by four of the informants constituted hearsay evidence and the fifth informant provided only conclusory accusations, the court determined that that evidence was not reliable and could not satisfy the "some evidence" standard in the absence of a credibility assessment of those informants and their underlying sources. Id., 79–81.

The present case is unlike *Luna* and *Sira* because, as previously explained, M initially provided a detailed, firsthand account to the police of the petitioner's sexual misconduct, which the petitioner himself partially corroborated in his own statement to the police. Accordingly, we conclude that there was sufficient, reliable evidence to support the petitioner's classification. We nonetheless acknowledge that, although there was sufficient evidence to support the classification, the testimony that the petitioner would have presented had he been allowed to do so may have cast that evidence in a different light sufficient to persuade Tugie that his sex offender classification was unwarranted. Moreover, as previously explained, because the petitioner was not afforded an opportunity to call witnesses in his defense, adequate notice of the evidence to be relied on by the department in making its classification decision, and an impartial decision maker ruling on his appeal, the department's classification of him as a sex offender violated his right to procedural due process.

II

We next address the petitioner's claim that the habeas court incorrectly concluded that the department did not violate his state constitutional right to substantive due process by classifying him as a sex offender. The petitioner argues that the department's system of classi-

Anthony A. *v.* Commissioner of Correction

fying prisoners as being in need of sex offender treat-
ment "[is] subject to strict scrutiny under the state
constitution because [it] targets a suspect class, namely,
persons with mental disabilities," and that the classifi-
cation system cannot withstand such scrutiny because
"classif[ying] . . . the petitioner as having [an STN]
score of 3, despite the fact that he has no need for
[sex] treatment, is not narrowly tailored to further [the
department's legitimate interest]" in "rehabilitating
. . . and preparing [inmates] for reentry into society."
The petitioner further argues that, "even if [his] claim
is subject to rational basis review, the [department's]
decision to classify [him] as a sex offender still violates
substantive due process because the classification
bears no reasonable relationship to any state purpose."
We disagree.

"The substantive component of the [due process
clause] . . . protects individual liberty against certain
government actions regardless of the fairness of the
procedures used to implement them." (Internal quota-
tion marks omitted.) *Greater New Haven Property
Owners Assn.* v. *New Haven*, 288 Conn. 181, 201, 951
A.2d 551 (2008). "Despite the important role of substan-
tive due process in securing our fundamental liberties,
that guarantee does not entail a body of constitutional
law imposing liability whenever someone cloaked with
state authority causes harm. . . . Rather, [the guaran-
tee] has been held to protect against only the most
arbitrary and conscience shocking governmental intru-
sions into the personal realm that our [n]ation, built
upon postulates of respect for the liberty of the individ-
ual, has struck between that liberty and the demands of
organized society." (Internal quotation marks omitted.)
Id., 202.

"[S]ubstantive due process analysis . . . provides
for varying levels of judicial review to determine
whether a state [policy] passes constitutional muster

Anthony A. *v.* Commissioner of Correction

in terms of substantive due process. . . . Similar to the analysis followed to determine equal protection challenges, [policies] that [impair] a fundamental constitutional right [or target] a suspect class . . . require that this court apply strict scrutiny to determine whether the [policy] passes [constitutional] muster . . . .'' (Citation omitted; internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 408, 119 A.3d 462 (2015); see also *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 831, 860 A.2d 715 (2004) (under strict scrutiny standard, ''state must demonstrate that the challenged [policy] is necessary to the achievement of a compelling state interest'' (internal quotation marks omitted)). Our state constitution provides: ''No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.'' Conn. Const., amend. XXI. We previously have held that ''[this] explicit prohibition of discrimination because of physical [or mental] disability defines . . . constitutionally protected class[es] of persons whose rights are protected by requiring encroachments on these rights to pass a strict scrutiny test.'' *Daly* v. *DelPonte*, 225 Conn. 499, 513–14, 624 A.2d 876 (1993).

''In the absence of a claim of deprivation of a fundamental right [or the targeting of a suspect class], we have scrutinized such questions under a rational basis test. . . . [Under that standard] [t]he party claiming a constitutional violation bears the heavy burden of proving that the challenged policy has no reasonable relationship to any legitimate state purpose . . . .'' (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Matos*, 240 Conn. 743, 750, 694 A.2d 775 (1997); see also *Ramos* v. *Vernon*, 254

Anthony A. *v.* Commissioner of Correction

Conn. 799, 841, 761 A.2d 705 (2000) ("[e]qual protection rational basis review is for all material purposes . . . indistinguishable from the analysis in which we would engage pursuant to a [substantive] due process claim" (internal quotation marks omitted)).

We agree with the habeas court that there is simply no evidence that the petitioner was classified as a sex offender on the basis of mental disability or psychiatric illness. The habeas court credited Tugie's testimony that her decision to classify the petitioner as a sex offender was based on M's statement to the police that he sexually assaulted her and the petitioner's own statement to the police corroborating, in part, M's account. Tugie's reliance on this information was consistent with her testimony that an STN score that is assigned on the basis of nonconviction information means a score assigned on the basis of information contained in an official report relating to a crime of which an inmate has been convicted indicating that the inmate, in the course of committing that crime, engaged in conduct that bears "some semblance" of a sex offense. The petitioner has identified nothing in the record to suggest that Tugie considered his mental disability. Accordingly, because the petitioner was classified based on neutral considerations that do not target a suspect class, the petitioner's claim is subject to rational basis review. See, e.g., *United States* v. *LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001) ("[s]ex offenders are not a suspect class"), cert. denied, 534 U.S. 1166, 122 S. Ct. 1181, 152 L. Ed. 2d 124 (2002).

The petitioner contends that the department's classification decision cannot withstand rational basis review because its practice of "leaving the [sex offender classification] in place for an inmate without [sex] treatment needs bears no reasonable relationship to [a department purpose]," that the procedure by which classifications are made, without input from a sex offender treatment

Anthony A. *v.* Commissioner of Correction

professional, is arbitrary, and that the restrictions on those inmates classified as sex offenders, precluding them from residing in a facility with a security level lower than three, is "entirely unrelated to treatment needs." These arguments are unavailing.

As previously indicated, the habeas court found that the petitioner's sex offender classification was "not punishment, but [a component] of [the department's] efforts to treat and rehabilitate [him]." Administrative directive 9.2 (1) explains that the policy served by classification, including sex offender classification, is "to promote effective population management and preparation for release from confinement and supervision." Sex offender classification, moreover, "focus[es] on the level of sexual [reoffense] risk and address[es] program intervention needs." Classification Manual, supra, § III (D) (6), p. 35. The department's interests in effective population management and rehabilitation are both legitimate and rationally related to its classification policy and procedure. See *McKune* v. *Lile*, 536 U.S. 24, 33, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002) ("[t]herapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism").

Accordingly, although the petitioner had every right to contest being classified as a sex offender on the basis of nonconviction information; see parts I and III of this opinion; the department's policy and process for classifying him as such do not come close to shocking the conscience. See *Waldman* v. *Conway*, 871 F.3d 1283, 1293 (11th Cir. 2017) (holding that classification of prisoner convicted of kidnapping minor as sex offender and conditions imposed thereto, including "requirement that he attend sex offender classes or therapy and his ineligibility for work release . . . are not so egregious as to shock the conscience" (internal quotation marks omitted)); *Coleman* v. *Dretke*, 395 F.3d 216,

224–25 (5th Cir. 2004) (denying claim that imposition of sex offender registration and therapy as conditions to parole of inmate not convicted of sex offense violates substantive due process because "sex offender treatment serves the government interest in protecting members of the community from future sex offenses" and therapy condition was not imposed "with the intent to injure"), cert. denied, 546 U.S. 938, 126 S. Ct. 427, 163 L. Ed. 2d 325 (2005). We therefore reject the petitioner's substantive due process claim.

III

We turn, finally, to the petitioner's claim that the habeas court incorrectly concluded that the department did not violate his right not to be "punished, except in cases clearly warranted by law," under article first, § 9, of the Connecticut constitution, by classifying him as a sex offender on the basis of nonconviction information. As previously indicated, the habeas court rejected the petitioner's claim that his classification was "punishment" in violation of article first, § 9, concluding, instead, that "[t]he petitioner ha[d] punished himself by not signing his OAP and then receiving a disciplinary ticket for that refusal. . . . The negative consequences emanating from his own decision [not to] sign the OAP have resulted in the loss of [risk reduction credit] previously earned, the inability to earn [risk reduction credit], and inability to be confined in a lower security level facility where additional programs are available." (Citation omitted.) The habeas court also rejected the petitioner's contention that the restrictions imposed on him were not warranted by law within the meaning of article first, § 9, because "he has never been convicted of a sex offense and . . . there is insufficient credible evidence that [he ever engaged in] acts of sexual violence against [M]." The habeas court concluded, rather, that the evidence was more than sufficient to support

Anthony A. *v.* Commissioner of Correction

a finding that the petitioner had engaged in acts of sexual misconduct against M.

On appeal, the petitioner renews his claim before the habeas court that ''[his] punishment . . . in the form of his classification as a sex offender is not warranted by law because [he] has never been convicted of a sex offense and there is not sufficient credible evidence to conclude that he ever committed a sex offense.'' We conclude that the petitioner's sex offender classification violated article first, § 9, because the petitioner was not afforded the process he was due under *Wolff* prior to receiving that classification.

Article first, § 9, of the Connecticut constitution provides that ''[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law.'' We previously have held that this provision is the criminal due process clause of our state constitution and that it provides no greater protections than those available under the federal constitution. See, e.g., *State* v. *Jenkins*, 298 Conn. 209, 259 n.39, 3 A.3d 806 (2010) (''the defendant's reliance on [article first, § 9] is, in essence, superfluous, because, in the search and seizure context, [that section] is our criminal due process provision that does not provide protections greater than those afforded by either the fourth amendment [to the federal constitution] or its coordinate specific state constitutional provision, article first, § 7''); *State* v. *Mikolinski*, 256 Conn. 543, 555, 775 A.2d 274 (2001) (''[w]e have generally characterized article first, § 9, as one of our state constitutional provisions guaranteeing due process of law'' (internal quotation marks omitted)); *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) (because article first, § 9, affords no greater rights than federal constitution, ''the principles underlying constitutionally permissible *Terry*[16] stops . . . define when

---

[16] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d (1968).

Anthony A. *v.* Commissioner of Correction

[investigative] detentions are 'clearly warranted by law' under article first, § 9'' (footnote added)).

"Read in its entirety, the text [of article first, § 9] indicates that the [meaning] to be assigned to the phrase 'clearly warranted by law' depends on the particular liberty interest that is at stake. Such a construction is, of course, entirely consonant with the general contours of a constitutional safeguard rooted in flexible principles of due process." Id., 178. Thus, we have held that "[t]he historical roots of [the phrase] 'except in cases clearly warranted by law' appear . . . to provide protection for personal freedom through a blend of statutory and constitutional rights that, like the text of . . . article first, § 9, incorporates no single constitutional standard." Id., 179.

In the present case, the liberty interest at stake is a prisoner's right not to be incorrectly classified as a sex offender and subjected to all the burdens attendant to that classification. See, e.g., *Renchenski* v. *Williams*, supra, 622 F.3d 326 ("[i]t is largely without question . . . that the sex offender label severely stigmatizes an individual, and that a prisoner labeled as a sex offender faces unique challenges in the prison environment"). In determining what protections attach to that right, "we [must remember] that one cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison. . . . Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (Internal quotation marks omitted.) *Vandever* v. *Commissioner of Correction*, supra, 315 Conn. 244; see also *Bell* v. *Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("[a] detainee simply does not possess the full range

of freedoms of an unincarcerated individual"); *Roque* v. *Warden,* 181 Conn. 85, 93, 434 A.2d 348 (1980) ("[p]risoners retain rights under the due process clause . . . but these rights are subject to reasonable restrictions imposed by the nature of the institution to which they have been lawfully committed" (citations omitted)). In other words, what is "warranted by law"; Conn. Const., art. I, § 9; for an incarcerated person is simply not the same as what is warranted for an unincarcerated person. As we explained in part I of this opinion, however, one of the rights that a prisoner retains while incarcerated is the right not to be classified as a sex offender on the basis of nonconviction information, without first being afforded the procedural protections set forth in *Wolff.* Because the petitioner did not receive the full panoply of those protections, we conclude that his classification violated article first, § 9, of our state constitution.

The judgment is reversed and the case is remanded to the habeas court with direction to issue a writ of habeas corpus and to direct the respondent to expunge the petitioner's STN score.

In this opinion the other justices concurred.

––––––––––––––––––––––––